JOHN C. HALE, PLAINTIFF IN ERROR, *v.* WILLIAM H. GAINES AND MARIA GAINES HIS WIFE, ALBERT BELDING, HENRY BELDING, AND GEORGE BELDING, HEIRS AND LEGAL REPRESENTATIVES OF LUDOVICUS BELDING, DECEASED, DEFENDANTS.

In an action of ejectment for the Hot Springs in Arkansas, wherein one party claimed title through a pre-emption claim which they were allowed to enter by the register and receiver, and the other party through a New Madrid certificate, (the title of the United States not being drawn into question,) the former party had the better title.

There was no regular survey and location of the New Madrid certificate until 1838, a prior application for a public survey in 1818, and certificate of a private survey in 1820, being irregular.

The act of Congress of April, 1822, required these locations to be made within one year from the date of its passage. Consequently, the right to locate the New Madrid certificate expired in April, 1823.

Nor does the act of 1843 support the survey of 1838, because it is not included within the provisions of the act.

Whether or not the title acquired under the pre-emption is valid, is a question not now before this court; because the case is brought up from the Supreme Court of Arkansas under the twenty-fifth section of the judiciary act, and the decision of that court was in favor of the validity of the action of the register and receiver; and, moreover, the opposing party cannot set up an outstanding title in the United States. In order to bring himself within the rule of that section, he must have a personal interest in the subject in litigation.

The claim set up under a prior pre-emption was of no value, the land having been reserved from sale when an offer to locate the pre-emption right was made.

THIS case was brought up from the Supreme Court of the State of Arkansas, by a writ of error, issued under the twenty-fifth section of the judiciary act.

It was an action of ejectment brought by William H. Gaines and the other defendants in error against John C. Hale, to recover the southwest quarter of section thirty-three, in township two south, of range nineteen west, containing one hundred and sixty acres. This claim was under the pre-emption act of Congress of the 29th of May, 1830, (4 Stat. at L., 420,) and the supplementary act of the 14th July, 1832, (4 Stat. at L., 603.)

The defendant below (Hale) claimed to hold by virtue of the fifth section of the pre-emption act of the 12th April, 1814, (3 Stat. at L., 122,) together with the act of 1st March, 1843, (5 Stat. at L., 603.)

The jurisdiction of this court was therefore clear.

The action was brought in the Hot Springs Circuit Court, (State court,) which, after a trial, gave the following judgment:

"It is therefore considered by the court that said plaintiffs, William H. Gaines and Maria Gaines his wife, Albert Belding, Henry Belding, and George Belding, do have and recover of and from the said defendant, John C. Hale, as well the possession of the tract or parcel of land described in their declaration in this behalf, as all that part of a certain tract or parcel of land designated on the public surveys as the southwest quarter of section thirty-three, in township two south, of range nineteen west, which lies between a dividing line sometimes called Mitchell's line, heretofore established by one Milus H. Wood and said Hale, between their respective possession on said quarter section and the northern or upper line of a place in Hot Springs Valley, commonly called Texas, and which part of said quarter section of land includes and embraces all the buildings, houses, out-houses, bath-houses, lots, enclosures, and gardens, connected with or pertaining to the tavern stand, sometimes and generally known as Hale's tavern stand, immediately below and south of the premises used and occupied by Warren & Stidham as a tavern stand during

the summer of the year 1851, and the said sum of five hundred dollars for their damages sustained in this behalf, and so as aforesaid assessed by the jury, as also all their costs in this behalf expended to be taxed, &c. And it is ordered by the court, that said plaintiffs do have execution hereof, by writ of possession for said land and premises, with com mand by levy and collect the damages and cost aforesaid, as is by law in such cases provided."

In the course of this trial, sundry bills of exceptions were taken, which, for the purpose of this report, it is not necessary to state particularly. Under them, the case was carried to the Supreme Court of Arkansas, which affirmed the judgment of the court below, except as to a question of damages, which need not be further mentioned.

The case was brought up to this court by a writ of error issued under the twenty-fifth section of the judiciary act.

It was argued in this court by *Mr. Frederick P. Stanton* for the plaintiff in error, and by *Mr. May* and *Mr. Watkins*, upon a brief filed by *Mr. May*, *Mr. Brent*, and *Mr. Watkins*, for the defendant in error.

*Mr. Stanton*, for the plaintiff in error, first attacked the title of the Beldings, as between them and the United States; but, as the court did not decide this point, the argument upon it is omitted.

The next point was to show that the act of 1843 extended to the benefit of pre-emptioners, under the act of April 12th, 1814. As this was the principal point in the case, his argument is reported as follows:

The act of 1814, already referred to as the foundation of Hale's title, relates back to the act of February 5th, 1813.

Stat. at Large, 2 vol., 797, 798.

These earliest among the pre-emption laws have no prohibition against a sale or transfer of the right derived under them, and hence such transfers were always treated as valid until subsequent laws made them null. The record shows Hale's title to be regularly derived from John Percifull, who settled

on the land in 1812, and continued to occupy it for many years afterwards.

Although in 1814 the land in question was in the county of Arkansas, one of the organized counties of the Missouri Territory, and therefore supposed to be subject to settlement and pre-emption, the General Land Office subsequently held the contrary, because the Indian title had not then been ex- tinguished. By the treaty with the Quapaw Indians, made November 15th, 1824, the land was ceded to the Government. The reservation act above quoted was passed April 20th, 1832.

The remedial act for the benefit of pre-emptioners under the act of 1814 was passed on the 1st March, 1843, (5 Stat., 603;) and as everything depends on the construction of this law, it is deemed proper to quote it at large, as follows:

" An act to perfect the titles to lands south of the Arkansas river, held under New Madrid locations and pre-emption rights under the act of 1814.

" *Be it enacted, &c.,* That the locations heretofore made of warrants issued under the act of 17th February, 1815, entitled ' An act for the relief of the inhabitants of the late county of New Madrid who suffered by earthquakes,' which were made on the south side of the Arkansas river, if made in pursuance of the provisions of that act in other respects, shall be perfected into grants in like manner as if the Indian title to the lands on the south side of said river had been completely extinguish- ed at the time of the passage of said act.

" SEC. 2. *And be it further enacted,* That in all cases in which the locations so made, &c., may have been sold, &c., the owner of the warrants, &c., shall have a right to enter other lands, &c.

" SEC. 3. *And be it further enacted,* That every settler on the public lands south of the Arkansas river shall be entitled to the same benefits accruing under the provisions of the pre- emption act of 1814, as though they had resided north of said river.

" SEC. 4. *Be it further enacted,* That all Cherokee pre-emptions which have been or may be located  *  *  *  south of the base line in Arkansas, shall be confirmed, and patents shall issue as in other cases."

The Indian title to the lands north of the Arkansas river had been extinguished by the treaty with the Osages, made 10th November, 1808.

7 Stat., 107.

In view of the rights of a bona fide settler on the Hot Springs tract in 1814, does the act of 1843 repeal the reservation act of 1832? The department holds the negative. Yet it is believed that the repugnance of the two statutes is such that they cannot be construed to stand together.

Not only the title, but the whole scope of the law, indicates that the purpose of Congress was to remove the difficulty arising from the Indian title resting on the lands south of the Arkansas in 1814, and subsequently. As a historical fact bearing on this point, the court is referred to the report of the committee which introduced the bill into the Senate. They expressly say that, inasmuch as the Indian title south of the Arkansas river had not been extinguished in 1814, and some pre-emptions had on that account been decided to be unlawful, "the bill therefore provides that the settlers on both sides of the Arkansas river shall be placed upon the same footing."

Sen. Rep. No. 36, 2d sess. 27th Cong.

The act of 1843 intended to confirm the pre-emption rights south of the Arkansas river *ab initio*—that is to say, it intended to place the pre-emptor in the position he would have occupied if the Indian title had been previously extinguished. That Indian title was the only obstacle; and the professed object of the law of 1843 was to remove that obstacle, to cure that defect of title, and to give full force and effect to the law of 1814, south of the Arkansas as well as north of it.

"A remedial act shall be so construed as most effectually to meet the end in view, and to prevent a failure of the remedy."

Dwar., Stat., 614.

"Beneficial statutes, therefore, have always been taken and expounded *ultra* the strict letter, but not, it is well and wisely said, *contra* the letter."

Ibid., 623.

"Every affirmative statute is a repeal of a precedent affirmative statute, where its matter necessarily implies a negative;

but only so far as it is clearly and indisputably contradictory and contrary to the former act 'in the very matter,' and the repugnancy such that the two acts cannot be reconciled; for then *leges posteriores priores contrarias abrogant.*"

Ibid., 530 to 531, and authorities there quoted.

The enactment of 1843 is, that "every settler south of the Arkansas shall be entitled." John Percifull was one of those settlers,. and he is included in the very words of the law—as much so as if the settlers had been enumerated and called by name. The Hot Springs were reserved in 1832, but John Percifull was settled there in 1814. The repugnance of the two laws is "in the very matter;" they cannot stand together.

Against this construction have been quoted:

Wilcox v. Jackson, 13 Pet., 513.

· Gear v. United States, 3 How., 120.

Of these, the latter alone deserves consideration, having an apparent application to the case in hand.

In the case of Gear, a lead mine was claimed by pre-emption, upon the ground that all the lands in a certain district were directed to be sold by a law passed in 1834, which law made some special exceptions, but did not except lead mines. This court held that the general law of 1807, which reserved all lead mines and salt springs from sale, was operative in the district mentioned, notwithstanding the broad terms of the law of 1834.

The facts of this case are almost the reverse of those now before the court. The act of 1807 was a general law reserving all salt springs and lead mines, and the policy of that law had been thereafter uniformly and consistently maintained in the disposition of all the public lands. On the other hand, the act of 1832 was a special reservation of an isolated exceptional tract of land, which at that time was already occupied by a settler.

The act of 1834, in Gear's case, was an act of ordinary legislation, establishing a new district for the sale of lands, apparently not contemplating a departure from the general policy prevailing in other land districts, and only indirectly and in ferentially affecting rights of pre-emption, which were not the

primary object of the law. On the contrary, again, the act of 1843 was a special act, designed to operate retrospectively upon a specified class of settlers, and to confirm a certain number of pre-emptions from their inception in 1814.

In Gear's case, from a series of laws *in pari materia*, and not necessarily repugnant, a presumption is attempted to be raised against the uniform well-settled policy of the laws, merely because the general terms of the last law do not exclude that presumption; while in the Hot Springs case there is no mere inference or implication to be drawn from general expressions or omissions, but there is an affirmative law, including this particular object in its very terms, and passed for that very purpose.

In the Gear case, the law might very reasonably be understood to mean, "all the lands in this district shall be sold, as far as the general policy of the laws allow such sales, and no further." In the present case, it would be necessary to interpolate in the law words of exception, thus: "Every settler on the public lands south of the Arkansas river," except the old pioneer, John Percifull, shall be entitled, &c.; the remedial policy of curing the defects of title under the act of 1814 shall not have its full effect; it shall cure everybody's title except John Percifull's.

Finally, in the one case, the general reservation was made long before the party had performed any act out of which his claim arose; in the other case, the act of settlement was performed long before the reservation, and the remedial act comes afterwards to recognise the meritorious character of the original act, and to remove an obstacle which prevented its operation at the time. The act of 1843 goes a quarter of a century behind the act of 1832, and legislates upon a particular state of facts known to have existed at that early day.

There is not a single argument used by the majority of the court in Gear's case, which has any bearing whatever on the present controversy. It is true there is one general expression, which is thought to cover this case, being a statement of the abstract rule or principle of construction applicable to the facts. It is as follows:

"The rule is, that a perpetual statute, (which all statutes are, unless limited to a particular time,) until repealed by an act professing to repeal it, or by a clause or section of another act directly bearing in terms on the particular matter of the first act, notwithstanding an implication to the contrary may be raised by a general law which embraces the subject matter, is considered still to be the law in force as to the particulars of the subject matter legislated upon."

It has already been shown that in the Hot Springs case there is "a section of another act directly bearing in terms on the particular matter of the first act," inasmuch as the words "every settler" necessarily comprehend the plaintiff in error. Indeed, so far as this court knows or can know from this record and the laws, John Percifull was the only settler in 1814 south of the Arkansas. There may have been others; but if there were not, then the law of 1843 would be without any operation, unless this case should be included. It can hardly be maintained that the construction of the law depends upon the number of cases included within it, or that Percifull's interest in the law of 1843 is to be defeated or established, according to the fact that the benefit of it is or is not to be shared by others.*

But, again, referring to the abstract rule stated by the court, as quoted above, it is not a mere "implication," raised by the act of 1843 against the reservation of 1832. It is a special and direct contradiction or repugnancy "in the very matter," for the reason already stated, viz: that the pre-emption on the Hot Springs tract is as certainly included in the very words

---

* Since this brief was prepared and in print, I have received the following letter from the Commissioner of the General Land Office:

GENERAL LAND OFFICE, *January* 26, 1859.

F. P. STANTON, Esq., present:

SIR: Your letter of the 12th instant, desiring to be furnished with a statement of the number of the pre-emptions claimed under the third section of the act of 1st March, 1843, entitled "An act to perfect the titles to lands south of the Arkansas river," &c., has been received, and in reply I have to state, that with the exception of the "Hot Springs" case, this office is not aware that any claims by pre-emption have been made under the above-mentioned act.

Very respectfully, &c.,    THOMAS A. HENDRICKS, *Commissioner.*

and in the necessary intendment of the law, as if it had been the only case of settlement south of the Arkansas river, in the year 1814.

*Quere.* Does the case of Gear *v.* the United States establish anything more than this: that a subsequent law directing lead mines to be sold does not so far repeal the act of 1807 as to make such mines subject to settlement and pre-emption ?

The right of pre-emption not being the object of the law of 1834, but only an incident to the fact of lands being in market, that incident does not attach in the prohibited cases of lead mines and salt springs.  If this be a fair statement of the point decided in Gear's case, it is evidently not at all like the case now before the court, because, in the latter, the very object of the law of 1843 was to confirm pre-emption rights themselves.

It has been already stated that the reservation act of 1832 presents a similar difficulty in the way of the Belding title under the act of 1830 and the supplementary act of the 14th July, 1832.  But there is this difference in the two cases: the two acts—that of the 20th April, and that of the 14th July, 1832— were passed at the same session of Congress, and of course, according to the established rule of construction, must have a more intimate relation than the acts of 1832 and 1843.  Inasmuch as Belding had acquired no right under the act of 1830, the reservation act of April might well be considered as an exception from the terms of the act passed in July following.

Unless this act of 1843 be construed to repeal the reservation act of 1832, it is admitted that no right accrues under the act of 1814.  The land office, having uniformly maintained the existing validity of the act of 1832, the parties to this record were never in a condition to make proof of their right to the satisfaction of the register and receiver.  In 1851, the Secretary of the Interior authorized an investigation, and it was then that he allowed the heirs of Belding to make their entry, as stated above, although he still insisted that the land was reserved from sale or entry by the law of 1832.

In the record will be found the proceedings of the register and receiver on the pre-emption claim of John Percifull.  They differed in his case, as they did in that of Belding's heirs.  If

these officers constitute a judicial tribunal, from which there was no appeal under the laws of 1814 and 1830, then both parties stand upon precisely the same footing; nor can it be of any importance that the Secretary of the Interior has undertaken to pronounce in favor of the one and against the other. It was not his province to decide at all.

All the later pre-emption laws provide for an appeal to the Commissioner, and finally to the Secretary. In the absence of any appellate power, the general principle of law applicable would pronounce the divided opinion to be equivalent to an adverse decision.

But it may be that the register and receiver, or either of them, have been so grossly partial, or so plainly regardless of credible testimony, as to give evidence of actual fraud. Is the false decision of the register and receiver, in such a case, to preclude forever the just claims which have been either corruptly, or capriciously and perversely, ignored?

In the case of Cunningham v. Ashley et al., 14 How., 377, the register and receiver had not acted on the proof at all; yet it was held that the proof ought to have been satisfactory to them, and this court decreed in favor of the pre-emption. What is the distinction between refusing to hear proof at all, and refusing to give it a fair and rational bearing upon the rights of parties? According to the principle laid down in Lytle v. the State of Arkansas, it is only when the register and receiver "act within the law, and the decision cannot be impeached for fraud or unfairness," that "it must be considered final."

In the cases quoted, however, the legal title had passed from the United States, and was in litigation between the parties. No such question is now presented to this court. Neither party to the record has the legal title; that still remains in the Government. The utmost result of the present proceeding will be to transfer the mere possession from one party to the other, without any power on the part of the court to compel the issuance of a patent. If, however, the jurisdiction be such as to authorize the court to determine the possession according to the equitable rights of the parties under all the

acts of Congress, there can be no doubt that the department will recognise and act upon the decision.

The action of the register and receiver being incomplete, their judgment being inoperative, and the grant suspended, the courts must examine the facts, in order to ascertain which party, under the laws, is entitled to hold the land. If, upon the facts, the register and receiver ought to decide in favor of one, and the President ought to issue a patent accordingly, if the case is still in that condition which admits of doing justice through the action of the executive officers themselves, even undoing all that may have been improperly done, surely the court will not hesitate to leave the naked possession with that party which has the superior equity, and is entitled to remain on the land.

The court below refused to hear any testimony, either to invalidate the entry made by Belding's heirs, or to establish the pre-emption right of John Percifull. No opportunity was given to prove fraud, which would make void the title of the plaintiffs below. The case must be sent back, in order that the material facts may be determined by a jury.

### The New Madrid Location.

This was not merely an outstanding title. Hale had purchased a portion of that interest, and produced it in his own right, as a defence to the action. All testimony on this point was excluded, although all formal objections to the New Madrid certificate and survey were waived.

Attorney General Reverdy Johnson thought this New Madrid location good and valid.

5 vol. Opinions, 237.

Cushing thought the contrary. See his opinion, 30t.. August, 1854.

The following points are taken from the argument of *Mr. Watkins* for defendants in error:

The New Madrid claim of Langlois, under which the plaintiff in error claims, is void, because it could not have been located as alleged in 1819. The title of the Juappan Indians

to the land south of the Arkansas river had not been extinguished at the passage of the New Madrid act of 1815.

> 2 Ins. and Opin., pages 158. 81, 91, 28, 10, 11, 13, 25, and 816.

The claimant had only a floating certificate of a right to locate, and there was an application in his name, by third persons, whose authority has not been proved, for a survey to include the Hot Springs; but there was no official survey, nor any record of it. Until returned to the recorder of land titles at St. Louis, from whose quasi judicial office the title emanated, and approved by him, and the claimant had reconveyed his injured land to the United States, and received a patent certificate from the recorder, no location could take place, so to give him a vested right to the land in question. Down to that period, and until the exchange of land took place, the claimant was not bound, but might abandon his proposed location, or change it for another, or sell his float, or elect to keep his injured land; and so the United States would be free to grant or dispose of its own land in any lawful way. A location begun, but not ended, is no location.

> Bagnell *v.* Broderick, 13 Peters, 436.
> Barry *v.* Gamble, 3 Howard, 51.
> Lessieur *v.* Rice, 12 Howard, 60.
> Cabune *v.* Lindel, 12 Missouri, 184.
> Kennett *v.* Cole, 13 Missouri, 140.

At the time of the alleged location, in 1820, no location could have been made in Arkansas Territory, because Congress, by the act creating that Territory, had diminished the area of location. Nor had the land in question been attached to any land office. It had not been surveyed, and was in no sense authorized to be sold.

> Stoddard *v.* Chambers, 2 Howard, 284.
> Mills *v.* Stoddard, 8 Howard, 365.
> Easton *v.* Salsbury, 23 Missouri, 100.

None of the subsequent New Madrid acts affect this case, so as to cure a defective location where none had been made, or where, if made, it would have been void.

In 1838, on application to the surveyor general of *Arkan-*

*sas*, a survey was made, and returned to the recorder of land titles in *Missouri*, who issued a patent certificate to Langlois. These proceedings were void, because those officers had no power over the subject. Arkansas was then a State, and no such location could be made. By the act of 26th April, 1822, the time for making locations had absolutely expired.

See Easton *v.* Salsbury, 21 Howard, 426.

So far as concerned the rights of the United States, this land had been reserved, and any location of it forbidden by act of 20th April, 1832. And the land was appropriated to the Belding pre-emption by the act of 29th May, 1830, at which time the right of the pre-emptor became vested. For like reasons, this New Madrid claim is not aided by the act of March 1st, 1843, which is in general terms, and might well apply to locations made during the life of the law, and valid in all other respects, except the one that act was intended to cure.

The Belding pre-emption is valid, notwithstanding the act of 20th April, 1832. The right of the pre-emptor had become vested on the 29th May, 1830. By the act of 14th July, 1832, he, as well as all persons so entitled, were allowed until after the completion of the public surveys to make proof and payment. Congress, no more than the settler, could know, in advance of the public surveys, on what tract his improvement would fall; and, taking the acts of the same session *in part materia*, the reservation act must be construed to prohibit any future location or entry, but not to impair a right already vested, or to take the land of one man, and reserve or grant it to another. Unless the pre-emption vested on the 29th May, 1830, the grant was illusory; and Congress, by the act of 14th July, 1832, recognised its plain duty of completing the public surveys, so as to enable claimants to comply with the conditions of the original law. All the decisions sustaining pre-emption rights as against a subsequent *grantee* of the Government, proceed upon the idea, that pre-emption acts, like other laws offering rewards upon conditions, are proffered contracts. When the conditions are complied with, the pre-emptor has a title by *contract*, with *relation* to the acts done, determining the period of time when the right vested.

*Hale* v. *Gaines et al.*

Lytle *v.* the State, 9 Howard, 334.
McAfee *v.* Keirn, 6 Smedes and Marsh., **789.**
Taylor *v.* Brown, 5 Cranch, 234.
McArthur *v.* Browder, 4 Wheaton, **448.**
Fenley *v.* Williams, 9 Cranch, **164.**
Isaacs *v.* Steele, 3 Scam., 79.
Benner *v.* Manlove; ib., 339.

No reservation or appropriation can prevail against a pre-emption right, unless it existed at the passage of the act, as was expressly held in Wilcox *v.* Jackson, 13 Peters, 511, and United States *v.* Fitzgerald, 15 Peters, 407. This precise question was adjudicated by this court in Lytle *v.* the State, 9 Howard, 334, and Bernard *v.* Ashley, 18 Howard, 45, where the question was between a pre-emption claim under the act of 1830, and grants made by Congress, after that act had expired, and before the act of 14th July, 1832.

This court has jurisdiction to sustain an equitable title, made a legal one by State legislation, subordinate to the powers of Congress, even though the rights of the United States be incidentally drawn in question. The only inquiry is, have the State courts correctly interpreted the laws of Congress?

United States *v.* Fitzgerald; 15 Peters, **407.**
Wilcox *v.* Jackson, 13 Peters, 511.
Carroll *v.* Safford, 3 Howard, 441.
Ross *v.* Barland, 1 Peters, 656.
Clark *v.* Smith, 13 Peters.
Bagnell *v.* Broderick, ib., 451.
Irvine *v.* Marshall, 20 Howard, 558.
Rector *v.* Gaines, 19 Ark., 80.

In Fenn *v.* Holme, 21 Howard, 481, the plaintiff in ejectment had no location, but a mere floating right; and the scope of the decision is limited to actions commenced in the United States courts.

Mr. Justice CATRON delivered the opinion of the court.

A contest for the ownership of the Hot Springs, in Arkansas, has been pending for some years before the General Land

Office, and in the courts of that State. One party derive their title through a pre-emption claim, as an occupant under the acts of Congress of 1830 and 1832, and the other by the location of a New Madrid warrant on the same land.

In December, 1851, the heirs of Belding were allowed to enter the quarter section, including the springs. This entry was held to be valid by the State courts, and to clothe them with a sufficient legal title to sustain an action of ejectment, according to the laws of Arkansas. They held the decision of the register and receiver, in favor of the occupant claimants, to be conclusive evidence of title, as against all persons who could not show a better opposing claim.

As between the titles of the United States and Belding's heirs, the State courts did not decide; but only, that the outstanding title in the United States could not be relied on by the defendant in this action; nor is the validity of the entry of Belding's heirs drawn in question in this court.

The defendant relied on a survey made in June, 1838, founded on a New Madrid certificate for 200 arpens.

To support this survey, an application was produced, dated 27th January, 1819, signed by S. Hammond and Elias Rector, addressed to William Rector, surveyor of the public lands, &c., asking to have surveyed and to be allowed to enter the recorder's certificate for 200 arpens, granted by him to Francis Langlois, or his legal representatives, and dated the 26th November, 1818, (No. 467.) The survey to be made in a square tract; the lines to correspond to the cardinal points, and to include the Hot Springs in the centre. In 1818, the spring was in the Indian country, to which, of course, no public surveys extended. And as the act of 1815, providing for the New Madrid sufferers, only allowed them to enter their warrants on lands "the sale of which was authorized by law," the unsurveyed lands could not be legally appropriated; and, of necessity, the surveyor general disregarded the application to have a survey made for Langlois. And thus the claim stood from 1818 to 1838.

The defendant offered in evidence the certificate of a private survey of the claim of Langlois, made by James S. Conway,

D. S., dated July 16th, 1820, which includes the spring. This paper the court also rejected.

Until the survey on Langlois's claim was presented to the recorder of land titles at St. Louis, and recognised by him as proper and valid, it could have no force, as this was the only mode of location contemplated by the act of 1815. So it has been uniformly held. Bagnell *v.* Broderick, 13 Peters, 436; Lessure *v.* Price, 12 Howard, 9.

The act of April 26th, 1822, validated locations of New Madrid certificates then existing, and which had been made in advance of the public surveys; but the second section of the act declared that future locations should conform to the public surveys, and that all such warrants should be located within *one year* after the passage of that act.

As the public surveys then existing in Missouri and Arkansas Territory were open to satisfy these claims, there was no difficulty in complying with the act of 1822.

Reliance is placed on the act of Congress of March, 1843, to maintain the survey of 1838, of the New Madrid certificate. That act provides, that locations before that time made on New Madrid warrants, on the south side of Arkansas river, if made in pursuance of the act of 1815 *in other respects,* shall be perfected into grants, in like manner as if the Indian title to the lands on the south side of the river had been completely extinguished at the time of the passage of said act of 1815. The act of 1843 does not apply to the survey and location of Langlois made in 1838, for several reasons:

1. The sale of the land thus surveyed was not authorized by law; the act of April 20th, 1832, having reserved from location or sale the Hot Springs, and four sections of land including them as their centre.

2. The attempted location was void, because barred by the act of 26th April, 1822, which act was not repealed or modified by the act of 1843. This act referred to locations made on the south of the river Arkansas, of lands regularly surveyed and subject to sale, and which locations had been made on or before the 26th April, 1823, when the bar was interposed.

We are of the opinion that the New Madrid survey of 1838

was altogether invalid, and properly rejected by the State courts.

It has been earnestly pressed on our consideration, that the entry of Belding's heirs is also void, because the land it covers was not subject to entry by an occupant claimant, or any one else, after the act of April 20th, 1832, had reserved it from sale.

Admitting it to be true, that the act of April, 1832, was passed when no individual claimant had a vested right to enter the land in dispute, still the 25th section of the judiciary act only gives jurisdiction to this court in cases where the decision of the State court draws in question the validity of an authority exercised under the United States, and the decision is *against* its validity. Here, however, the decision was in favor of the defendant's entry, and sustained the authority exercised by the department of public lands, in allowing Belding's heirs to purchase. Moreover, the plaintiff in error is not in a condition to draw in question the validity of Belding's entry. He relies on an outstanding title in the United States to defeat the action. Being a trespasser, without title in himself, he cannot be heard to set up such title. "To give jurisdiction to this court, the party must claim for himself, and not for a third person, in whose title he has no interest." Henderson *v.* Tennessee, 10 How., 323. The plaintiff in error must claim (for himself) some title, right, privilege, or exemption, under an act of Congress, &c., and the decision must be *against* his claim, to give this court jurisdiction. Setting up a title in the United States, by way of defence, is not claiming a personal interest affecting the subject in litigation. This is the established construction of the 25th section of the judiciary act. Montgomery *v.* Hernandis, 12 Whea., 132.

If it was allowed to rely on the United States' title in this instance, the right might be decided against the Government, where it was no party, and had not been heard.

A claim is set up in defence, that John Percifull was entitled to a preference of entry under the act of 1814; which act, it is insisted, was revived by that of 1843, section 3. Suppose

that Percifull's right to appropriate the land in dispute was undoubted, and that the register and receiver had allowed the heirs of Belding to enter wrongfully; still, the courts of Arkansas, in this action of ejectment, had no right to interfere, and set up Percifull's rejected claim.

But this is of little consequence, as, when the act of April, 1832, was passed, reserving the Hot Springs from sale, Percifull had no vested interest in the land that a court of justice could recognise. Then, the United States Government was the legal owner, and had the power to reserve it from sale; so that the offer to purchase in 1851, under the assumed preference to entry claimed for Percifull, was inadmissible. Had the entry been allowed, in face of the act of Congress, such proceeding would have been merely void.

These being the only questions within our jurisdiction worthy of consideration in the causes Nos. 15, 16, 17, 18, and 19, it is ordered that the respective judgments rendered there in by the Supreme Court of Arkansas be affirmed.