GAINES *et. al. v.* HALE & RECTOR,

AND

RECTOR *v.* HALE, *on cross appeal.*

UNITED STATES—*Title to Indian country.*—The United States holds the fee simple to the lands occupied by the Indian tribes, and may, if it seem fit, disregard their right of occupancy, and, before a cession by the Indians, convey, either an unincumbered title in fee simple, to take effect immediately, or a title subject to their right of possession, and to take effect only, when they, by voluntary cession, shall have yielded their title.

POLICY—*Of government.*—The policy of the government has been to protect the lands occupied by the Indians from settlement, and not to convey the title until the possessory rights of the Indians have been extinguished; therefore, it is not to be presumed that the United States intended that the act of 12th April, 1814, should extend to lands south of the Arkansas river, the title to which was not ceded to the Federal government until August, 1818.

TERM, 1870.     Gaines, *et al. v.* Hale & Rector.

HOT SPRINGS.—The Hot Springs and four sections of land, including the Springs, were reserved from entry and sale, by the act of April 20, 1832.

The effect of the third section of the act of March, 1843, was not put in to extend the act of 1818, to land on the south side of the Arkansas river, as of its time of passage, but simply as of the time of the passage of the act of March 1843, and rights vested under it, as against the government only from and after that date.

CHEROKEE—*Pre-emption claims.*—Cherokee pre-emption claims could not be located on the four sections of land, including the Hot Springs as their center, after the passage of the act of April, 1832.

IMPROVEMENTS ON PUBLIC LANDS—Settlers making valuable improvements on the public lands, reserved for the exclusive use of the government, have not been regarded as trespassers, and such improvements are, by statute, protected as property. The interest which a person has in such improvements, is a possessory right against all the world except the United States or their grantee.

WHO MAY CANCEL CERTIFICATES.—It is well settled that, either the secretary of the Interior or the commissioner of the general land office may cancel a certificate of entry or patent, when erroneously issued.

PROOF OF SETTLEMENT—The act of the 29th May, 1830, required proof of settlement or improvement should be made to the satisfaction of the register and receiver, prior to any entries being made, and in default of such proof of settlement or improvement, no interest vested in the pre-emption claimant.

JUDGMENTS—*When not enforced.*—A judgment based on a certificate of entry, which has been properly cancelled, being inequitable, will not be enforced.

NEW MADRID CERTIFICATES—A location of a certificate under the New Madrid Acts, is, the actual survey of the land, and a return of the plat by the surveyor to the recorder of land titles, and its approval on the part of the government, and until such survey, return and approval, the title remains in the government, nor was this changed by the act of April 29th 1816.

*Appeal from Hot Springs Circuit Court.*

HON. LIBERTY BARTLETT, Circuit Judge.

*Watkins & Rose,* for Gaines *et al.*

In all cases of grants, the interpretation should be most favorable to the public and most strongly against the grantee.

*Townsend v. Brown 4 Zabr. 80; Mayor, etc. v. Ohio and Penn. R. R. Co. 26 Penn. S. R. 355; Green's Estate, 4 Md. Chy. Decis. 349; McLeed v. Burroughs, 9. Geo. 213; Harrison v. Young, 1b. 359; Hagan v. Campbell, 8 Port., 9.*

Continuity of possession is the vital principle of a pre-emption; and a voluntary removal will be deemed an abandonment. *Jacobs v. Figans, 25 Penn. S. R. 45; Watson v. Gilday, 11 Serg. & R. 340; Farmer's Bank v. Woods, 11 Penn. S. R. 113; Goodman v. Losey, 3 Watts and S. 526; Bledsoe v. Cains, 10 Texas, 458; Simpson v McLemore, 8 Ib. 448; Clemens v. Gottshall, 4 Yeates, 330; Byron v. Sarpy, 18 Mo., 460; Page v. Scheibel, 11 Ib. 167.*

No reconveyance by Paxton is anywhere shown. Nothing but a reconveyance could restore the title. *Strawn v. Norris, 21 Ark. 82; Simpson v. McLemore, 8 Tex. 448.*

In *Burgess v. Gray, 16 How. 64,* the Supreme Court held that the courts could not correct mere errors into which an officer of the land office had fallen, in making a decision upon a question of entry. Where any matter is adjudicated by a tribunal of peculiar and exclusive jurisdiction, such adjudication is conclusive upon all other courts, unless impeached upon the ground of fraud. *Wilcox v. Jackson, 13 Pet. 511; Vorhees v. U. S. Bank, 10 Pet., 478; U. S. v. Arredondo, 6 Ib. 729; Foley v. Harrison, 15 How. 448; Bordon v. State, 11 Ark. 547; Nick's heirs v. Rector, 4 Ark. 284; 2 Laws, Instructions and Opinions, (Ed. 1868,) p. 85, No. 57; Gaines v. Hale, 16 Ark. 25; Mithchell v. Cobb, 13 Ala. 139; McGhee v. Wright, 16 Ill. 557; Lewis v. Lewis, 9 Missouri, 186.*

The policy of the government has been to protect the Indians, no less from their own improvidence, than from the oppression so easily exercised over them. So *individals* have not been allowed to acquire titles to land from them even by purchase. *Gaines v. Nicholson, 9 How., 365; Cherokee Nation v. State of Georgia, 5 Pet. 17; People v. Dibble, 16 N. Y. (2 Smith,) 212; Dale v. Irish, 2 Barb. Sup. Ct. R. 641; Fellows v. Lee, 5 Denio, 628; Public Lands, Laws, Instructions and Opinions, Pt. II. p.*

*29, No 25; Ib. p. 92, No. 59; see, also, ib. No. 54, p. 81; No. 10, p. 10: No. 11, p. 11; No. 12, p. 13; No. 23, p. 25; No. 787, p. 816; Strong v. Waterman,* 11 *Paige, 607.*

But the same territory had been formerly ceded to the government by the treaty with the Osage Indians in 1808. *See 7 U. S. Stat. at Large,* 107. If it had included these lands, we are not able to see how it would effect the question, since the United States afterwards acknowledged the title of the Quapaw Indians by purchase, and so is now estopped from denying it. *Sherwood v. Vanderburg, 2 Hill, 307; Boone v. Porter, 17 Wend., 164; Davis v. Darrow, 12 ib., 67; Hitchcock v. Harrington, 6 Johns., 293; Collins v. Terry, 7 Ib., 279; 2 Ib., 123; 19 Maine, 69; 1 Ib., 183; 12 Wend., 57; 14 Johns.. 225; Threadgill, v. Pintard, ubi. sup.*

A conveyance by a pre-emptor, before the issuance of a patent, is absolutely void. *Glenn v. Thistle, 23 Miss., (1 Cush.,) 42; Craig v. Tappin, 2 Sandf, Chy., 78; Moore v. Jordon, 14 La. An., 414; Terison v. Martin, 13 Ala., 29; Forbis v Bowen, 1 A. K. Marsh., 407.*

It becomes plain that if Percifull had no rights to his preemption, then he was not injured by the establishment of Belding's pre-emption. *Graham v. Roark, 23 Ark., 19; Cunningham v. Ashley, 13 Ark., 303, 320; Jones v. Reyburn, 11 Ib., 389; 1 Sto. Eq. Jur., sec. 203; Hulls v. Thompson, Smedes & M., 489; Young v. Bumpass, Freeman's Chy. R., 250; Juzan v. Toulmine, 9 Ala., 684; Conrod v. Nicholl, 4 Pet , 296, 310; U. S. v. Arredondo, 6 Ib., 716; Meux v. Anthony, 11 Ark. 418; Edmundson v. Hildreth, 16 Ill. 215; Wynn v. Morris, 16 Ark. 434.*

The tenant may deny the landlord's title after the end of the time, and he may show that the landlord's title has expired. *Smith's Landlord and Ten., 81; Co. Litt., 476; 57 Eng. Common Law, 400; 2 Smith's L. C., 660; 1 Vermont, 302.*

The relationship of landlord and tenant cannot affect the question. *Pelham v. Wilson, 4 Ark. 289; McFarland v. Mathis, 10 Ark. 560; Floyd v. Ricks, 14 Ark., 290; Graham v. Roark,*

*23 Ark. 23; 2 Land Laws, Instructions and Opin., 367, 542; 3·
ib., 129, 182, 188; Jennings v. DeCordova, 20 Texas, 508;
Kennedy v. Wiggins, 5 Humph., 127; Reese v. (David) Crockett,.
8 Yerg., 133; Loftus v. Mitchell, 3 A. K. Marsh., 594; Davis v.
Gray, 3 Littell, 450.*

In the case of *Rector v. Ashley, 6 Wallace, 143,* the court·
held that : "in perfecting a title to land located under the act
of February 17, 1815, for the benefit of the inhabitants of New·
Madrid, no vested interest in the land, nor any appropriation·
of it binding on the United States, was affected until after the·
survey was made and returned into the office of the recorder
of land titles." *Bagnell v. Broderick, 13 Pet., 436* ; *Barry v.
Gamble, 3 How., 51; Lessieur v. Price, 12 ib., 60; Rector v.
Ashley, 6 Wallace, 142; Rector v. Ashley, 6 Wall., 151* ; *Rector·
v. Gaines, 19 Ark., 84.*

Such claims, by the act of 1815, could only be located on·
lands which were public, *and the sale of which was authorized by·
law. Hale v. Gaines, 22 How. 158.*

By an act of April 26, 1822, the time for making locations·
of New Madrid claims was limited to *one gear from that date,.*
at which period they were to become *void,* if not before located..
And the Supreme Court expressly held that this identical
claim of Langlois *did become void on that day,* and that it was·
not revived by the act of 1843. *Hales v. Gaines, 22 How. 159.*

The land had already been reserved from sale by the act of
April 20, 1832.

Because Belding had acquired the land by pre-emption·
under the act of May 29, 1830, this pre-emption would neces--
sarily prevent the location of a New Madrid certificate on the·
land, as Rector had acquired no vested interest in the land at
that time. *Lytle v. State, 9. How. 334; McAfee v. Keirr, 6 Sm,.
& M. 789; Taylor v. Brown, 5 Cranch. 234; McArthur v. Brow-
der, 4 Wheat. 488; Fenley v. Williams, 9 Cranch, 164; Isaacs v.
Steele, 3 Scam. 79; Benner v. Manlove, Ib. 439; Gaines v. Hale
16 Ark. 9; Winn v. Morris, 1 b. 434.*

BELDINGS' CLAIM.—The plaintiffs have asserted the validity·

·of their titles, and they must sustain them, or their bills must be dismissed. *Rice v. Harrell, 24 Ark. 402.*

The act under which Percifull claimed, of April 12, 1814, required inhabitancy and cultivation, but the act of May 29, 1830, required no more than previous cultivation and settlement, or occupancy. *Wynn v. Morris, 16 Ark. 426; Gaines v. Hale, 16 Ark. 19.*

If Belding was entitled to a pre-emption, his interest vested immediately on the passage of the act. *Brown v. Clements, 3 How. 666.*

No reservation of land can be made after a citizen has acquired a right to it under a pre-emption law. *U. S. v. Fitzgerald, 15 Pet. 407; Brown v. Clements, 3 How. 666, Lytle v. State, 9 How. 333; Marks v. Dickinson, 20 How. 501; Stephens v. McCargo, 9 Wheat, 502; Doe v. Stephenson, 9 Tanner, (Ind.) 148; Lytle v. State, 17 Ark. 644; Wynn v. Morris, 16 Ark. 414; Rector v. Gaines, 19 Ark. 80; Lytle v. State, 9 How. 314; Lytle v. State, 17 Ark. 608.*

In *Evans v. St. Louis Public Schools, 32 Missouri, 27,* it was properly held that plaintiff's title having been held by the Supreme Court of the United States to be void, ·he could not file a bill to hold the defendant a trustee for his use.

And these decisions, made on this same subject, are final, ·conclusive, irrevocable and unimpeachable; so much so, that even if this court should now conclude them to be wrong, it could not change them. They are as matters adjudicated and forever at rest. *Story v. Livingston, 13 Pet. 367; Nelson v. Hubbard, 13 Ark. 256: Fortenbury v. Frazier, 5 Ib. 202; Porter v. Hanley, 10 ib. 191; Walker v. Walker, 7 ib. 556; Pulaski county v. Lincoln, 13 ib. 104; Rector v. Danley, 14 ib. 307; Story ex parte, 12 Pet. 339; Sibbald v. United States, ib. 492; Wirt v. Brasheok, 14 ib. 54; Boyle v. Grundy, 8 ib. 190.*

*English, Gantt & English, Clark & Williams and H. Flanagin*, for Hale.

The several claims to the tract of land in controversy may be classed and discussed in the following order:

1. THE PERCIFUL PRE-EMPTION CLAIM, represented by John C. Hale, the successful claimant in the court below.

2. THE BELDING PRE-EMPTION CLAIM, represented by William H. Gaines, and others, heirs of Belding.

3. THE NEW MADRID CLAIM, represented by Henry M. Rector, which covers part of the tract and goes over on the adjoining tract.

1. THE PERCIFULL PRE-EMPTION CLAIM.—This claim is founded upon the pre-emption act of 12th of April, 1814, and at the time of the passage of this act, the land on which the Hot Springs are situated, was part of the territory of Missouri. *U. S. St. L. vol.* 3, *pp.* 122–3; *Bright. Dig. p.* 511; 2 *St. L.* 283; 2 *St. L.* 743; *Geyer's Dig.* 30; *Geyer's Dig. Laws of Mo. sec.* 7, *p.* 133; 3 *Stat. L.* 493. The tract in controversy was never surveyed until 1838.

We submit that the evidence clearly shows that Percifull, under whom Hale claims, cultivated and inhabited the land in controversy, prior to the 12th of April, 1814, and continued to occupy and possess the same, either by himself or tenants, from about the year 1809, up to 1836, when he died. That after the land was surveyed, in 1838, and before it was offered at public sale, (and it never was), the proof of the pre-emption right of John Percifull, under act of 12th April, 1814, was filed with the register and receiver of the land office at Washington, Arkansas, by Sarah Percifull, widow, and David Percifull, son and only heir of John Percifull. *See Folio Trans. p.* 61 *to* 71. The application was rejected on *the ground* that part of the land claimed had been previously located by New Madrid certificate, No. 467, in the name of Francis Langlois, or his legal *representatives*—and *not* for the *want of proof of cultivation or inhabitancy* by Percifull. It will be observed that

this attempted location of the New Madrid certificate was made about the year 1820, and long after the pre-emption right of Percifull, under the act of 12th April, 1814, vested. *See Folio Trans. p.* 73. In October, 1843, after Hale became interested in the Percifull pre-emption, the application was renewed, to enter the land, by Sarah Percifull, on the same grounds as before, with additional proof. *See Fol. Trans. pp.* 81-2-3.

As to the inhabitancy, cultivation, etc., by John Percifull, as before stated, the judge, sitting as chancellor, in the court below, found in favor of Percifull—(*See decree, Fol. Tr. p.* 399), and as to the correctness of this finding, *see Branch v. Mitchell,* 24 *Ark.* 443; *also, see note of the Rep. p.* 8, 24 *Ark.*

A cultivation by members of a family, his hired hands, servants, etc., or persons under his direction, is a sufficient cultivation within the meaning of the pre-emption acts. *See Op. Atty. Gen.* 1791 *to* 1838, *pp.* 1087, 1171-2.

That the going to Red river to hunt for a year or two by Percifull, was *not* an *abandonment* of his pre-emption right, acquired by inhabitancy and cultivation, and did not work a forfeiture of it under the terms of the act of 12th April, 1814, which could only be done by removing from the territory (and this the witnesses state he never did.) *See Wynn vs. Morris,* 16 *Ark.* 414; *Wynn v. Garland, ib.* 440.

It is insisted by counsel for Belding's heirs, that the Percifull pre-emption claim was not assignable, and therefore Hale has no valid claim to the land.

It is true, that by the third section of act of 29th May, 1830, assignments and transfers of the right of pre-emption, prior to the issue of patents, were made void. (*Bright. Dig., p. 470, sec. 66.*) But the act of 23d January, 1832, so modified this clause as to permit the transfer of certificates, and patents to issue to assignees. (*Bright. Dig., p.* 470.) But for these statutory restraints, under 29th May, 1830, pre-emption rights would have been transferrable, like all other rights in property. But there is no such restraint in the act of the 12th of April, 1814. On the contrary, by the terms of the act, the right

of pre-emption in the purchase of land is given to every person, *and the legal representatives of every person*, who has inhabited and cultivated, etc. See *Dickson v. Richardson, adm'r.*, 16 *Ark.*, 118; *McDaniel v. Grace, et al.*, 15 *Ark.*, 484.

It is immaterial whether the government would issue the patent in this case to Percifull and his heirs, or to Hale; if to the former, the patent would enure to the benefit of the latter under the assignment, and equity would protect his rights. These are rights which are recognized as assignable in equity, which are not transferable at law. *Buckner v. Greenwood*, 1, *Eng.* 206, *and cases cited.*

But it is contended that the United States had no title in 1814, and therefore could give no pre-emption ; that the title was in the Indians.    We submit that neither the United States government, or any European government, ever recognized any right in the Indians, except such as was conceded by treaty, and that the Quapaws never had any such recognized reservation, until the treaty of 24th Aug., 1818, and the Hot Springs were not included in this reservation.    (*Sec.* 7, *Statutes at L. p.* 176, *Little, Brown & Co. ed. by Peters.*    The territory, including the land in controversy, had been organized into a county in 1813, and was represented in the Missouri Legislature—prior to the treaty with the Quapaws.    *See Geyer's Dig. L. Missouri*, *p.* 133, *Sec.* 7.    The acceptance of the United States, in the treaties, of cessions of territory by the Indians, was not an acknowledgment of title in them, but as a matter of policy to prevent trouble.    This land had been purchased from France by treaty in 1803. (*See* 8 *U. S. Statutes at Large, p.* 200.) There was no treaty at that time between Spain and the Indians, much less one conceding these lands.    (*See* 2, *Statutes at Large*, 245, 575, 251, 286, *Sec.* 1.)    287, *Sec.* 12, 331 : 641.    No rights were recognized in the Indian tribes to the land, except such as were given by treaty.    *See Johnson & Graham, Lessee vs. McIntosh*, 8 *Wheat*, 543 (*Peters Condensed Rep.*, 515.)    There was no reservation of title to the Indians in the treaty with Spain.    *See Marsh v. Brooks*, 14 *How. Rep.*, 513.    The fact

that no allusion was made to any such treaty in the treaty of 1818, is a strong presumption there was none. An unextinguished Indian title, is not inconsistant with a seizen in fee, by the State. *Fletcher v. Peck, 6 Cranch, 87, Curtis, Dec. 328.* An Indian tribe or nation, within the United States, is not a foreign State within the meaning of the 2d section, 3d article, Constitution of the United States, and cannot sue in the courts. *Cherokee Nation v. State of Geo. 5 Peters 1; 9 Curtis Dec. 178; also as to Indian title, 3 Kent. Com. Marg. p. 379.* In contest between the United States and grantee of lands, title of the Indian is not before the court. *6 Peters, 681; 10 Curtis, Dec. 315, p. 355, particularly.* Where one obtains a grant of. land, subject to the Indian possessory right, his title is perfect, when the United States extinguishes that possessory right. *Cornet v. Winston, Lessee, 2, Yerger Rep. 143;* See, also, *14 How., 513, 522; 20 Curtis Dec., 312; Blair, et al., in Pathkiller's Lessee, 2 Yerger Rep., 407; United States. in Fernando, 10 Peters, 303; 12 Curtis Dec., 134; Martin v. Waddel, 16 Peters 367; 24 Curtis Dec., pp. 347–8; George Gamble's case, 2 Tenn. Rep., 170.*

DECISION OF THE REGISTER AND RECEIVER.—It is not true, as insisted by Belding's counsel, that the register and receiver sitting as a court, had decided against the inhabitancy and cultivation of Percifull. On the contrary, there was a division of opinion; see *Fol. Trans., p. 168–9:* see *Fol. Tr., 139–40.* But even if they had so decided, that decision would not have been conclusive, but could be reviewed on a direct proceeding for that purpose. See *Bernard's heirs v. Ashley, 18 How., 43; State of Missouri v. Batcheldor, 1 Wallace, 109; Lyttle v. State, 22 How., 193; O'Brien v. Perry, 1 Black., 139; Lindsey, et al., v. Haines, et al., 2 Black., 554.* See, also, *Wynn v. Gacland, 472.*

BELDING PRE-EMPTION CLAIM.—This claim is founded on the act of Congress, approved 29th May, 1830. See *Bright. Dig., 459, § 64, etc., 4 Stat. L., p. 420.* That whatever possession

or right Belding may have had, or claimed, was not in *his own right*, but as tenant, by virtue of a lease from Percifull; see *Opinions of Register and Receiver, Fol. Tr. p. 222-3-4-5.* That the reservation act of April 20, 1832, was fatal to the pre-emption claim of Belding's heirs; see *letter of the Commissioner to the Register and Receiver, Fol. Tr., p. 124-5.* The permission given Belding's heirs to make entry, by the opinion of the secretary of the Interior, was for a specific purpose only, it conferred no right or admitted any title, but only, that the parties might be placed in a position to contest the claims of each other in the courts; see *Fol. Tr., p. 126.* That the certificate issued to Belding's heirs was illegal, and afterwards directed to be cancelled; see *Fol. Tr., p. 359, 101, 108.* But suppose Belding cultivated and occupied the land within *the letter* of the act 29th May, 1830, and after the expiration of that act, his heirs had the right to make proof of the pre-emption and apply to enter the land under the reviving act, and that the proof, application and entry were *formally* regular, so as to vest in them such title, as a certificate of entry ordinarily passes, we submit that this title in equity and under the facts of the case, would enure to Percifull, the landlord. See *Op. At. Gen. 1791 to 1838, p. 722.*

A tenant cannot dispute the title of his landlord; nor set up a title acquired by him, adverse to his landlord. *Taylor on Landlord and Tenant,* § *629, p. 450; William v. Watkins, 3 Peters., 43.* A tenant cannot acquire a title adverse to his landlord's. *Wilson v. Smith, 5 Yerger, 379; 9 Vermont, 37; Marley v. Rogers, 5 Yerger, 217.* A tenant, who enters under a particular title, though he may acquire a better title, cannot avail himself of it against the title under which he has entered.

*Garland & Nash,* for Rector.

After arguing the case at length upon all the main points involved, submitted the following:

In the printed argument heretofore submitted by us, in this

cause, in advocacy of Rector's claim, we alluded to a case between *Gaines and wife and others, and Thompson and Wilson, (pp. 52, 53, 54); commenced in the circuit court of the United States for the District of Columbia. In the printed brief we attempted to show the decision of the circuit court in that case was correct, and since our brief was filed, the Supreme Court of the United States, on an appeal in that case, affirmed the decision of the circuit court, and the decision of the Supreme Court we present with this, and respectfully call the attention of the court to it. *7 Wallace, 347.* This decision, we take it, leaves the order of Secretary Thompson as the law of the case, so far as the Belding certificate is concerned, and this sweeps away all pretense of claim on the part of the misguided heirs of Belding; and we here repeat, that as this officer has directed its cancellation, the Belding certificate stands now as if cancelled; and in addition to the authorities already referred to by us on this, *(2 Danl. Ch. Pr. 1192, 1204, 1209)* we would cite *Hunt v. Lemin, 4 Stew & Port. (Ala., 138; Higeras v. The United States, 5 Wallace (U. S.) 827.*

Then, of course, Rector's possession, even without title, if you please, cannot be interfered with by the Beldings, who have no title and are out of possession, and we here call the attention of the court to the authorities cited by us on pages 54 and 55, of our printed brief. And the rule that Rector's mere possession is good against one who has no title, goes so far, and is so well recognized by the courts that his bill of complaint here would be maintained, and his injunction made perpetual to secure him in his possession, if nothing else. As between the parties having the same rights in law, the courts always quiet possession, and enjoin the other party from interfering with him who is in possession. So that if Rector had, in his bill, conceded his title, as against the United States, to be invalid, but set up his possession, and asked the court to protect him in it as against the Beldings, whose claim in law is no better, the court must grant this relief. This is always done between parties thus situated : *4 Kent's Com., 371; Broom*

*v. Max, 638, (3d London Edition); Snower vs. Williams'
heirs; 4 Dana (Ky.) 460; Clements vs. Warren, 24 How. (U. S.)
397; Pettijohn v. Akers, 6 Yerger (Tenn.) 448, 451; U. S. v.
Stanley, 6 McLean 409; Curtis v. Sutton, 15 Cal. 127; Hire v.
Draper, 10 Barbour (N. Y.) 455; Strete et al v. Fish, 2 Minne-
sota 153; Smith v. Brannon, 13 Cal. 107; 2 Eden on Injunction,
425–4 (Waterman); Williards' Equity, 303, 328.*

And this relief to protect the possession, merely, is not
inconsistent, at all, with the prayer for special relief, as indeed
it is a part of that prayer; and if the court cannot grant all
the relief asked, it will grant as much as the facts sustain, and
as may not be incongruous with the general object and scope
of the bill. *Adams' Equity, p 308–9 and note 1; 13 Arks.
Rep's 183; 15 Ib. 555–6; 19 Ib. 62; 20 Ib. 332.*

While it is true that Rector is complainant in the bill, yet
this is in no sense an original bill—it is a mere weapon of
defense, not of aggression; it is a suit growing out of, and
auxillary to the ejectment suit, and is the mode by which Rec-
tor defends himself, both as to title and possession against the
Belding claim. His defense could not be heard, as we have
seen, in the ejectment suit, because it was *equitable* and not
*legal;* therefore he had to change his forum to make his
defense, and in filing a bill to do so, it is not an original suit,
but, in truth, a defense against the Belding suit; and the court
will regard all the parties, now, precisely as if Rector were
defending in the ejectment suit, on matters that could be heard
in that suit, and that Rector is just where he was, as to pos-
session, etc., when the ejectment suit was pending and was
tried. This position is recognized by countless decisions of the
first courts in the Union. *Williams v. Byrne, Hemp. Reps. 473;
Logan v. Patrick, 5 Cranch, 288; Dunlap v. Stitson, 4 Mason,
349; Dunn v. Clark, 8 Peters, 3; Simmons v. Guthrie, 9 Cranch
19;* and especially, *Freeman v. Howe, 24 How. (U. S.) 460.*

This being true, in every sense of the word, and the govern-
ment not being a party here, and not complaining against
Rector, although his title is not good against the government,

yet it is as good as the Belding claim, and is upheld by possession of years standing, acquired and continued with the knowledge and acquiescence of the government. This court will not, we humbly submit, turn him out of possession, and let in the worthless claim of Belding, but will, for the purpose of this suit, hold his claim good, protect him in his possession, and leave him and the government to settle the title hereafter. In other words, if convinced all the claims are no account, yet as the party who holds the title is not before the court, possession must turn the scale on a comparison of the claims asserted. This is right, and is equity. The court would be compelled to do this in this case, particularly, as our law protects Rector in his improvements on the public land, or the government land, if the court should hold this to be the land of the government. The statute giving this protection is broad and comprehensive. *Gould's Dig. chap. 61, p. 439.*

So, in no event, can the Beldings, on their cancelled certificate, which is the foundation of their judgment, disturb Rector in his possession of the premises, even if the court should decree Rector's title is not good as against the government, which we do not think will be held, after a careful and thoughtful review of this record and the points as presented.

STORY, Special C. J.

Gaines, in an action of ejectment, in the Hot Springs circuit court, recovered judgments against Hale and tenants, and Rector and tenants, for the possession of the south-west quarter of section 33, in township 2, south of range 19 west, including the Hot Springs, which judgments were affirmed by the Supreme Court of this State and the United States.

Hale and Rector filed separate bills, each claiming an equitable title to the land in controversy, superior to the legal title of Gaines; prayed that their rights might be declared, their title quieted, and that a perpetual injunction issue restraining the execution of the judgment in ejectment.

An interlocutory injunction was granted.

The chancellor decreed that Hale's claim, to the quarter section in controversy, was good; that his title should be quieted, and that a perpetual injunction should issue restraining the enforcement of the judgment in ejectment against him.   The chancellor further decreed that a certain portion of Rector's claim, not in conflict with Hale's, to lands outside of the south-west quarter of section 33, in township 2, south of range 19 west, had been established, and that his title to so much of his New Madrid claim should be quieted.   Gaines and Rector both appealed from the decree, so far as it confirmed Hale's title to the quarter section in controversy.

The rights of the claimants are before the court for settlement, and we will dispose of them in their chronological order.

For this purpose, we will first examine the right of John C. Hale, who represents what is proven as the Percifull pre-emption claim.

This claim is founded upon the act of April 12, 1814, section five of which act is in the following words: "That every person, and the legal representatives of every person, who has actually inhabited and cultivated a tract of land lying in that part of the State of Louisiana, which composed the late territory of Orleans, or in the territory of Missouri, which tract is not rightfully claimed by any other person, and who shall not have removed from said State or territory, shall be entitled to the right of pre-emption in the purchase thereof, under the same restrictions, conditions, provisions and regulations, in every respect, as is directed by the act entitled "An act giving the right of pre-emption in the purchase of lands to certain settlers in Illinois territory," passed, February 5, one thousand eight hundred and thirteen, (1813).   *U. S. , St. L. vol. 3, pp. 122–3.*

Several objections have been raised to the Percifull claim, which we will pass, and proceed at once to consider the question which we believe to be decisive of Hale's right to the land in controversy, viz : Was the south-west quarter of sec-

tion 33, in township 2, south of range 19 west, included in the act of April 12, 1814?

At this time the Indian title to the lands south of the Arkansas river had not been extinguished.

By treaty, made August 24, 1818, between the United States and the Quapaw Indians, approved by the President on the fifth of January, 1819, these lands were formally ceded to the government.

For the purpose of determining this question, it may be well to consider the status or condition of the different Indian tribes in the relation they bear to the United States.

Chief Justice MARSHALL, in the case of the *Cherokee Nation* *v. The State of Georgia, 5 Peters, 17,* says: "Though the Indians are acknowledged to have an unquestionable and heretofore unquestioned right to the lands they occupy, until that right shall be extinguished by a voluntary cession to our government, yet it may well be doubted whether those tribes which reside within the acknowledged boundaries of the United States can, with strict accuracy, be denominated foreign nations. They may more correctly, perhaps, be denominated domestic dependent nations. *They occupy a territory to which we assert a title independent of their will,* which must take effect, in point of possession, when their right of possession ceases. Meanwhile they are in a state of pupilage."

Coinciding with their status, as defined by Chief Justice MARSHALL, is the language in *Gaines et al. v. Nicholson et al. 9 How. 365,* where the court, speaking of the effect of a reservation in an Indian treaty to a specific tract of land, say: "There is no doubt but that all persons in whose behalf reservations were made under the treaty, and who were residents upon any particular tract, and had made improvements thereon at its date, were entitled to the section, including their improvements, in preference to any other right that could have been previously acquired under the government, because the land embraced within the section was so much excepted from the cession. No previous grant of Congress could be paramount,

according to the rights of occupancy which the government has always conceded to the Indian tribes within her jurisdiction."

It appears, then, that the United States holds the fee simple of the land occupied by the Indian tribes; and while it is the *policy* of the government to recognize the right of occupancy until it may be extinguished by voluntary cession, the nation may, if it see fit, disregard this right, and, before a cession by the Indians, convey either an unencumbered title in fee simple, to take effect immediately, or a title subject to the Indians' right of possession, and to take effect only when the Indians, by voluntary cession, shall have yielded their title.

The question before us, however, is not one of power, but of intention. We think the cases of *Fletcher v. Peck, 6 Cranch, 87; Lattimore v. Paleet, 14 Peters, 4: Clark et. al. v. Smith, 13 Peters, 195*, clearly show that the United States may convey the land before the Indian title has been extinguished. The policy of the government, however, and one that is founded in principles of justice and humanity, has been to protect such lands from settlement, and not to convey the title until the possessory right of the Indians has been extinguished.

Such being the policy of the government, it is not to be presumed that the United States intended that the act of April 12, 1814, (in which it expressly provided that the right of preemption should not extend to any tract which is rightfully claimed by any other person,) should extend to lands in the occupancy of the Quapaw Indians.

At the time of the passage of the act, Percifull's settlement was antagonistic to their claim, the justness of which claim the United States, and all persons claiming under them, are estopped, by the treaty of the 24th of Agust, 1818, from denying. We are not without authority to sustain us in the position we have taken.

Thus, in the case of *Danforth v. Wear, 6 Wheat., 675*, the court say: "As to lands surveyed within the Indian boundary,

this court has never hesitated to regard all such surveys and grants as wholly void."

In a late case, *Threadgill v. Pintard, 12 How., 37,* the court, speaking of the same territory acquired from the Quapaw Indians, and of the act of April 12, 1814, say: "It must be conceded that the first settlers upon this land, the Indian title to it not having been extinguished, could claim, under the act of 1814, no pre-emption right. No laws giving to settlers a right to pre-emption, can be so construed as to embrace Indian lands. Such lands have always been protected from settlement and survey by penal enactments." See *Preston v. Browder, 1 Wheat., 115: Danforth v. Thomas, ib. 115.*

We think the authorities cited, clearly show, that the act of 1814, did not apply to the land on which Percifull had "inhabited and cultivated" prior to April 12, 1814, and that, consequently he acquired no rights under the act. On the 20th of April, 1832, Congress passed an act, the third section of which provided, "that the Hot Springs, in said county, together with four sections of land, including said Springs, as near the center thereof as may be, shall be reserved for the future disposal of the United States, and shall not be entered, located or appropriated for any other purpose whatever." *4 Stat. at L., 505.*

Percifull did not claim under any act prior to the act of 1832, reserving the Hot Springs, except the act of April 12, 1814. In fact, neither Percifull nor his representatives made any attempt to pre-empt the land until more than six years after it had been reserved from entry and sale.

In March, 1843, Congress passed an act which provided; "that every settler on land, south of the Arkansas river, should be entitled to the same benefits accruing under the provision of the pre-emption act of 1814, as though they had resided north of said river. *5 St. at L., 603.*

The counsel for Hale do not insist that Congress, by a general law, in 1843, intended to repeal a special one, the reservation act of 1832, but they declare that Percifull had an inchoate right

under the act of 1814, which, by force of the act of 1843, became a vested interest and relates back to the passage of the act of 1814.

We cannot agree with counsel in this respect, for we think we have clearly shown that on the 20th day of April, 1832, Percifull had no right, inchoate or otherwise, to the land in controversy, that could affect the power of Congress to withdraw it from entry and sale. The effect of the third section of the act of 1843, was the same as though an act had been passed, similar in its terms to the act of 1814, authorizing preemptions on the south bank of the Arkansas river, and rights vested under it, as against the government, only from and after its passage. The act of April 20, 1832, having reserved the Hot Springs from pre-emption, and it being conceded that this reservation was not repealed by the act of 1843, it is apparent that the act of 1843, did not apply to the four sections of land including the Hot Springs as their center.

If we needed any assurance of the correctness of our conclusion we have it in the case of *Hale v. Gaines, 22 How., 160,* wherein the court, after fully considering the effect of the act of March, 1843, upon Percifull's interest to the land in controversy, say: "A claim is set up in defense, that John Percifull was entitled to a preference of entry, under the act of 1814, which act, it is insisted, was revived by the act of 1843. Suppose that Percifull's right to appropriate the land in dispute was undoubted, and that the register and receiver had allowed the heirs of Belding to enter wrongfully, still the courts of Arkansas, in this action of ejectment, had no right to interfere and set up Percifull's rejected claim. But this is of little consequence, as, when the act of April, 1832, was passed, reserving the Hot Springs from sale, Percifull had no vested interest in the land that a court of justice could recognize."

Hale applied to enter the section in controversy, in October, 1850, under a Cherokee pre-emption claim, founded upon the act of the 26th of May, 1824, concerning pre-emption rights in Arkansas territory, and the supplemental act of March 3, 1843.

The counsel for Hale, very properly, appear to place but little reliance upon this claim, since, more than eighteen years previous to the attempt to locate the Cherokee pre-emption, the land in controversy had been reserved from entry and sale.

The next question that presents itself for our consideration is, what rights has Rector, who claims the equitable title, if any there be, that may have accrued to Langlois, or his representatives, under a New Madrid certificate, No. 467, for two hundred arpents (or 170 $\frac{15}{100}$ acres) of land.

A full history of Rector's claim, and the grounds on which he relies, may be found in *19 Ark.*, 70.

His claim is based upon the act of February 7, 1815, (*3 Stat. at Large, 211,*) which provided that any person owning land in New Madrid county, Missouri territory, materially injured by earthquakes, should be authorized to locate the like quantity of land on any of the public lands of that Territory, "the sale of which is authorized by law." The second section of the act provides: "That whenever it shall appear to the recorder of land titles for the Territory of Missouri, by the oath or affirmation of a competent witness or witnesses, that any person or persons, are entitled to a tract or tracts of land under the provisions of this act, it shall be the duty of said recorder to issue a certificate thereof to the claimant or claimants; and upon such certificate being issued, and the location made, on the application of the claimants, by the principal deputy surveyor for said Territory, or under his direction, whose duty it shall be to cause a survey thereof to be made, and to return a plat of each location made to the said recorder, together with a notice in writing, designating the tract or tracts thus located, and the name of the claimant on whose behalf the same shall be made; which notice and plat the said recorder shall cause to be recorded in his office, and shall receive from the claimant, for his services on each claim, the sum of two dollars for receiving the proof, issuing the certificate and recording the notice and plat as aforesaid."

Section 3 provides, "that it shall be the duty of the recor-

der of land titles, to transmit a report of the claims allowed and locations made, under this act, to the commissioner of the general land office, and shall deliver to the party a certificate, stating the circumstances of the case, and that he is entitled to a patent for the tract therein designated; which certificate shall be filed with the said recorder, within twelve months after date, and the recorder shall, thereupon, issue a certificate in favor of the party, which certificate being transmitted to the commissioner of the general land office, shall entitle the party to a patent, to be issued in like manner as is provided by law for other public lands of the United States."

Rector prefers his claim under two surveys, one made by J. S. Conway, deputy surveyor, on the 16th of July, 1820, and the other by John C. Hale, deputy surveyor, on the 28th of February, 1838.

The survey of 1820, was not returned to the recorder of land titles, and Rector's claim under this survey, in the language of his counsel, is reduced to a single question: "Was it indisputably necessary that the plat and certificate of survey, made upon this New Madrid warrant and location, should have been returned to the recorder's office, in order to give the applicant an incipient right and inchoate title to the land so located by the actual survey?"

This question has been repeatedly passed upon and settled, in the cases of *Bagnell v. Broderick, 13 Peters, 346; Barnes v. Gamble, 3 How., 51; Lessieure v. Price, 12 How., 60; Hale v. Gaines, 22 How., 146; Rector v. Ashley, 6 Wallace, 142,* that claimants, under the act of 1815, acquired no rights whatever, until the plat and certificate of survey were presented to the recorder of land titles and approved by him. The Supreme Court of the United States is the authoritative expounder of the acts of Congress, and these decisions are a sufficient answer to the learned argument, that the survey is the location, and that rights vest as soon as the survey is made, rather than from the time a return of the plat is made to the recorder and approved by him.

Counsel for Rector have filed two briefs, of fifty-eight and sixty-eight pages respectively, in which they have insisted that the Supreme Court of the United States, commencing with the case of *Bagnell v. Broderick*, down to the case of *Rector v. Ashley*, have omitted to notice the act of April 29, 1816, and its effect upon the act of February 7, 1815.

If this were true, it would certainly be a most remarkable case of judicial oversight.  A careful examination of the act, however, will show that counsel are mistaken, and that the practical effect of the act of 1816, so far as it changes or modifies the act of 1815, is simply to abolish the office of principal deputy surveyor and all other deputy surveyors' offices that had previously been established under either the Spanish or Federal government, within the limits of the Territories of Missouri and Illinois, and provides for the office of a surveyor of said Territories, to which all the plats and papers of the different surveyors' offices which had been abolished should be sent, and that the surveyor, so provided for, should perform the duties of the principal deputy surveyor.

The practice, after the passage of the act, was not changed. "The warrant or location certificate issued from the recorder's office, and there it was returnable; that the plat and certificate were returned and recorded; that officer issued the patent certificate; in that office the law required all official business to be transacted, and not in the surveyor's office." That the notice of location, and plat and certificate, were recorded in the surveyor's office is true, and it was proper. It was not done, however, to the end of furnishing evidence of title to the claimant, but to have evidence there to show that the land was appropriated according to the New Madrid act, and for the convenience of the surveyor's department.  The plain meaning of the law is as above stated, nor can its import be changed by the practice pursued in the surveyor's office.

The mistake made by the counsel for Rector, has arisen from their having construed the words, in the act of 1816, "any office heretofore established or authorized for the purpose of

*executing or recording surveys of land*, within the limits of the Territories of Missouri and Illinois," to mean all recorder's offices, rather than surveyor's offices, through ignorance of the fact that the notice of location and plat and certificate were *recorded* in the surveyor's office, not to the end of furnishing evidence of title to the claimants, but to have evidence there to show that the land was appropriated according to the New Madrid act, and for the convenience of the surveyor's department. *Lessieure v. Price, 12 How., 71.*

The next question that presents itself is, what right did Rector acquire under this second survey, made by John C. Hale, in February 28, 1838?

In the case of *Hale v. Gaines et al. 22 How. 158*, Hale, who by agreement with Rector, has a two-fifths interest in the New Madrid claim, pressed upon the court all the legal and equitable grounds on which Rector bases his right of relief.

Justice CATRON, who announced the decision of the court, very carefully considered and passed upon the rights that had accrued under the New Madrid certificate. He says: "The defendant (Hale) relied upon a survey made in June, 1838, founded upon a New Madrid certificate for two hundred arpents. To support this survey an application was produced, dated 27th January, 1819, signed by S. Hammond and Elias Rector, addressed to William Rector, surveyor of the public lands, etc., asking to have surveyed and be allowed to enter the recorder's certificate for two hundred arpents, granted by him to Francis Langlois, or his legal representatives, and dated the 26th of November, 1818, (No. 467.) The survey to be made in a square tract, the lines to correspond to the cardinal points, and to include the Hot Springs in the center. In 1818 the springs were in the Indian country, to which, of course, no public surveys extended. And, as the act of 1815, providing for the New Madrid sufferers, only allowed them to enter their warrants on lands, the sale of which "was authorized by law, the unsurveyed lands could not be legally appropriated, and of necessity the surveyor general disregarded the applica-

tion to have a survey made by Langlois, and thus the claim stood from 1818 to 1838."

The act of April 26, 1822, validated locations of New Madrid certificates then existing, and which had been made in advance of the public surveys, but the second section of the act declared that future locations should conform to the public surveys, and that all such warrants should be located within *one year* after the passage of the act. As the public surveys, then existing in Missouri and Arkansas territories, were open to satisfy these claims, there was no difficulty in complying with the act of 1822.

Reliance is placed on the act of Congress of March, 1843, to maintain the survey of 1838, of the New Madrid certificate. That act provides that locations, before that time made on New Madrid warrants, on the south side of Arkansas river, if made in pursuance of the act of 1815, in other respects, shall be perfected into grants in like manner as if the Indian title to the land on the south side of the river had been completely extinguished at the time of the passage of said act of 1815.

The act of 1843 does not apply to the survey and location of Langlois, made in 1838, for several reasons :

*First.* The sale of the land thus surveyed was not authorized by law—the act of April 20, 1832, having reserved from location or sale the Hot Springs, and four sections of land including them, as their center.

*Second.* The attempted location was void, because barred by the act of 26th of April, 1822, which act was not repealed or modified by the act of 1843. This act referred to locations made on the south of the river Arkansas, of lands regularly surveyed and subject to sale, and which locations had been made on or before the 26th of April, 1823, when the bar was interposed.

We are of the opinion that the New Madrid survey of 1838 was altogether invalid, and properly rejected by the State courts. *Barry v. Gamble, 3 How. 51; Rector v. Ashley, 6 Wallace, 142.*

We have not forgotten that in several of the cases cited, it was the legal title which was decided, and that in the present case, it is the equitable title we are required to pass upon; but, as was remarked in *Rector v. Ashley, 6 Wallace, 151,* the rights of claimants are to be measured by the acts of Congress, and not exclusively by what he may or may not be able to do; and if a sound construction of that act shows that he acquired no vested interest in the land until the officers of the government had surveyed the land, and until that survey is filed in the office of the recorder, and approved by him, then, as claimant's rights are created by that statute, they must be governed by its provisions, whether they be hard or lenient.

If it be possible for any case to come within the rule of *res adjudicata*, this appears to do so.

Hale and Rector allege, in their bills, that they have made valuable improvements on that portion of the land in controversy, now in their possession; that Belding has no rights, legal or equitable, to the land in controversy, and pray the court to grant an injunction perpetually restraining the enforcement of the judgments in ejectment.

It is insisted, on the other hand, that the validity of Belding's claim is not now in question; that the plaintiffs must recover on the strength of their own title, and not on the weakness of that of the defendant; that Hale and Rector are trespassers; that they have no rights to maintain, no injuries to redress.

We concede the legal position taken by the counsel for Belding to be true, but not the facts; settlers making valuable improvements on the public lands, which at the time are not reserved for the exclusive use of the government, have not been regarded as trespassers. This State, by statute, treats and protects such improvements as property, and enforces the right of possession as against all persons who have neither a legal or equitable title to the *land.*

In the case of *Pelham, adm'r. v. Wilson, et al., 4 Ark. 289,* the court say: "The interest that a person has in an improvement,

on the public land, is of a peculiar kind, known only to our laws. It is a possessory right against all the world but the United States."

In *Cain v. Leslie, 15 Ark. 312,* the court say : "A sale of an improvement on public land is recognized by statute, and the purchaser acquires a possessory right which the law protects, and which is good against every body but the government or its grantee." *Hughes v. Sloan, 8 Ark. 146; McFarland v. Matthias, 10 Ark. 560.*

The Federal government, while it punishes those who are purely trespassers, and commit depredations on the public lands, has uniformly rewarded those who, in good faith, have made valuable improvements. If the legal representatives of Belding have any rights here, they have sprung from just such trespasses, and it is difficult to perceive why the same act in Belding should be rewarded, and in Hale and Rector treated as an offense.

It appears that Hale and Rector have made improvements worth fifty thousand dollars, and a court of equity that would permit a third party, without right, through a voidable and inequitable judgment, to take possession of this property, would sadly fail in executing the object for which it was established. Though neither Hale nor Rector have any rights which, measured by the acts of Congress, have as yet matured into a title to the land, it does not follow that they have no privileges or immunities whatever. They are tenants, at sufferance, of whoever may have the legal title, by the laws of this State, entitled to the possession of their improvements, and cannot be ousted except by some one who has a superior right of possession.

We shall therefore proceed to examine what rights may have accrued to Gaines and others, as the legal representatives of Belding; and if we find that they have no legal or equitable claim, as against Hale or Rector, to the lands in their possession, that the judgment at law is irregular and voidable, as it

13

is alleged to be, the prayer for a perpetual injunction will be granted.

The judgments at law in the Beldings' favor, were based upon a certificate of entry, which, on the 7th of June, 1860, by order of the secretary of the Interior to the commissioner of the general land office, was cancelled.

The act of March 3, 1849, gives to the secretary of the Interior the power of supervision and appeal in all matters relating to the general land office, co-extensive with the authority of the commissioner, to adjudge, and it is well settled that either the commissioner of the general land office or the secretary of the interior may cancel a certificate of entry, or a patent, whenever the same has been improperly issued. The land officers perform a ministerial duty, and, though it may be conceded that when rights have vested, such cancellation would not affect or divest those rights, yet, if erroneously issued, the error should be corrected, in order that parties who have no legal or equitable title to the land, may not, by means of a worthless paper, oust those who have rights which are protected either by Federal or State laws. *Maguire v. Tyler, 1 Block, 195; Dozwell v. De LaLauza et al., 20 How. 29; Belle v. Hearne et al. 19 How. 252.*

It is therefore proper for us to inquire whether the action of the secretary of the Interior, in cancelling the certificate of entry, was correct, and the effect of such cancellation.

Belding's pre-emption is claimed under the act of 29th May, 1830, which provides "that every settler or occupant of the public lands, prior to the passage of this act, who is now in possession, and cultivated any part thereof in the year 1829, shall be, and he is hereby authorized to enter with the register of the land office, for the district in which lands may lie, by legal subdivisions, any number of acres, not more than one hundred and sixty, or to a quarter section, to include his improvements, upon paying to the United States the minimum price of said land."

Section 3 provided "that prior to any entries being made,

under the privileges of this act, proof of settlement or improvement shall be made to the satisfaction of the register and receiver."

It is admitted that Belding failed to make the proof, required by the act, until after the passage of the reservation act of April 20, 1832. The question then presents itself, when does a claimant, under the act of May 29, 1830, acquire a vested interest in the land?

We think there can be no doubt that Congress did not intend that the gratuity should vest in the claimant until after he had made proof of settlement or improvement to the satisfaction of the register and receiver, which, by the terms of the act, is a condition precedent to the right of entry.

The fourth section expressly provides that the provisions of the act shall not be available to any person who shall fail to make the proof and payment required, before the day appointed for the commencement of the sale of lands, including the tract on which the right of pre-emption is claimed; and the fifth section limits the operation of the law to one year.

If the claimants' rights grew out of the settlement and vested on the passage of the law, these sections are mere nullities; for, the right having vested, the commencement of the land sales, or the lapse of a year, would not destroy it. The passage of the act gave to settlers who had cultivated in 1829, and were still in possession, the privilege of pre-empting, if they saw fit so to do, but they were required to exercise this privilege within one year, and before the commencement of the land sales. On making proof to the satisfaction of the register and the receiver, the right to an entry vested, but failing to make this proof within one year, and before the commencement of the land sales, the privilege of a pre-emption was at an end.

It is objected to this ruling that, as the lands were not surveyed at this time, and that Belding, therefore could not comply with so much of the act as required proof of settlement or improvement before the 29th day of May, 1831, and as he had

done all that it was in his power to do, his right vested without making such proof. But as we have before held, the rights of claimants must be measured by the acts of Congress, and must be governed by its provisions, whether they be hard or lenient.

We have not overlooked the fact that Judge WALKER, in delivering the opinion in the case *of Gaines et al. v. Hale, 16 Ark. 21*, very strongly intimated that the reservation act of 1832, did not affect Belding's right to a pre-emption, and that his interest vested from the passage of the act of 1829. He relies on the case of *Lytle et. al. v. The State of Arkansas et. al. 9 How., 314*, to sustain him in this opinion.

We think a careful examination will show a material difference in the two cases.

In the latter case, Cloye's heirs, in addition to their having cultivated the land in 1829, and being in possession in 1830, proved settlement to the satisfaction of the register and receiver, and made payment. It differs also in this, that Governor Pope did not attempt to locate, under the act of the 15th of June, 1832, until after the passage and during the life of the act of 14th of July, 1832, which extended the time for one year from the date of the act, in which to make proof of settlement or improvement to the satisfaction of the register and receiver.

Justices CATRON, NELSON and GRIER, dissented from the opinion, and insisted that Cloye's heirs had no vested right in the land at the time the act of June 15, 1832, was passed.

The basis on which Judge WALKER founds his opinion, we think, sustains our decision. Quoting from the case of *Lytle v. The State of Arkansas*, he says: "The claim of a pre-emption is not that shadowy right which, by some, it is considered to be. Until sanctioned by law it has no existence as a substantial right. But when covered by the law, it becomes a legal right subject to be defeated only by a failure to perform the conditions annexed to it."

Belding failed to perform the conditions annexed; that is,

to make proof of settlement or improvement, to the satisfaction of the register and receiver, and, therefore, had no rights after the time allowed by the act to perform the conditions annexed had passed.

Belding, therefore, acquired no vested interest in the land prior to the 20th day of April, 1832, at which time Congress withdrew the land from entry or sale. No act passed after the act of April, 1832, could vest an interest in the four sections of land, including the Hot Springs as their center, without repealing that act.

No subsequent act did repeal the act of April, 1832.

It then follows, that, as the land in controversy had been withdrawn by act of Congress from entry or location, and appropriated for the future disposal of the United States, the action of the register and receiver, in undertaking to grant preemption in land in which the law says they shall not be granted, though made under the direction of the commissioner of the general land office, was erroneous and void, and the action of the secretary of the Interior, in cancelling the certificate of entry, was proper.

The certificate of entry having been properly cancelled, the judgment at law based upon it must fall.

By the laws of this State the certificate was evidence, which could not be attacked in a court of law, of an inchoate right, which might mature into a perfect title, sufficient to maintain the action of ejectment.

It is well settled that any fact which clearly proves it to be against conscience to execute a judgment at law, and of which the injured party could not have availed himself in a court of law, or of which he might have availed himself, but was prevented by fraud or accident, unmixed with any fault or neglect in himself or his agents, will authorize a court of equity to interfere by injunction. *Maine Insurance Company v. Hodgson, 7 Cranch, 332; Adams' Eq., 5, Am. ed. 391; and cases cited.*

It is, therefore, the duty of this court to declare the rights

of the parties as though this erroneous certificate of entry had not been made.

The rights of parties in the public lands are set forth by the laws of this State, under the title of ejectment, the second section of which provides, that: "The action of ejectment may also be maintained in all cases where the plaintiff claims possession of the premises under or by virtue of, *first*, an entry made with the register and receiver of the proper land office of the United States; *second*, a pre-emption right under the laws of the United States; *third, where* an improvement has been made by him, on any of the public lands of the United States, whether the lands have been surveyed or not, and where any other person, than those to whom the right has been given by the preceeding claims of this section, is in the possession of such improvements."

We have just decided that none of the parties to this suit, so far as the record shows, are entitled to the possession of the Hot Springs and four sections of land including them as their center, by virtue of an entry made with the register and receiver of the proper land office of the United States, (the Belding certificate of entry having been cancelled,) nor by virtue of a pre-emption right under the laws of the United States.

The record abundantly shows, however, that all of the parties have made improvements upon different portions of the land, and, under the laws of this State, have a peculiar title, protected by the courts, and are entitled to the possession of their improvements until ousted by the Federal government.

It is urged that the plaintiffs in the suits at law, cannot be inhibited from enforcing their judgment, for the want of a special prayer for a perpetual injunction, but an examination of the record will show that Hale, on page —— of his bill, prays as follows: "May it please your honor to grant unto your orator, the State's most gracious writ of injunction, issuing out of and under the seal of this honorable court, commanding the said William H. Gaines, and Maria, his wife,

Albert Belding, Henry Belding and George Belding, heirs of Ludovicus Belding, and Henry M. Rector, their counsellors, attorneys, solicitors and agents, commanding them, and each of them, absolutely to desist and refrain from proceeding to have any writs of restitution or writs of possession, or mandate of any kind, of and concerning the possession of the land aforesaid, issued or in any manner executed against your orator, until the final termination of this suit in equity, *and that they be perpetually enjoined;*" and Rector, on page 55, of his bill, prays, "that the said judgment obtained in the said action of ejectment be *perpetually* enjoined; and such plaintiffs, their agents and attorneys, be enjoined from issuing out process to obtain, or obtaining possession of the premises named in the suit."

We think these prayers may well be held to be sufficiently specific, as prayers for a perpetual injunction, and, even if not so construed, we think there would be no good reason for not declaring the judgments to be void, and thereby prevent their enforcement.

A writ of injunction may be described to be a judicial process, whereby a party is required to do, or refrain from doing, a particular thing, and the most common sort, is that which operates as a restraint upon the party in the exercise of his real or supposed rights, and this is sometimes called the "remedial writ of injunction." The other kind, commanding an act to be done, is sometimes called the judicial writ, because it issues after a decree, and is in the nature of an execution to enforce the same.

It appears to be the settled practice, not to grant the remedial writ, unless it is specially prayed; because it has been said, the defendant might make a different case by his answer against the general words of the bill, from what he would have done against the specific prayer for an injunction; but this is not true of the judicial writ, which is used for the purpose of enforcing the decree of the court, and it may be issued under the general prayer for relief.

The entire frame and prayer of Hale's, as well as Rector's bill, is to have the judgments at law, and all the claims of title set up by other parties, declared to be void, to have his title defined and enforced, and the judicial writ, which is simply a decretal order enforcing the rights of the complainants, is granted as a necessary consequence of the decree.

It is, therefore, considered that the decree of the Hot Spring circuit court be, and the same is hereby set aside; that the judgments at law, and all claims of title made by parties to this suit, except as hereinafter specified, be declared to be void; that each and all of the parties to this suit, be and are decreed to have a possessory right and title to the respective improvements made by them, as against each other; that each party pay his own costs, and that all necessary orders be made to enforce this decree.

It is, therefore, considered that the decree of the Hot Spring circuit court be, and the same is hereby set aside.

And, it is further ordered, that each and all of the parties to this suit, be decreed to have title to the respective improvements made by them, as against all parties but the United States, and that all parties be and are inhibited from enforcing the judgments at law, and that each party pay his own costs.

MCCLURE, J., dissenting, says:

The view I take of this case renders it unnecessary for me to discuss the rights of any of the claimants to the Hot Springs. If my findings had been in accordance with the majority, I would have been compelled to dissent from so much of the decree, as perpetually enjoins Gaines from enforcing his judgment at law.

The heirs of Belding, who are represented by Gaines, prior to 1855, commenced an action of ejectment against Hale and Rector, and certain tenants holding under them, in the Hot Spring circuit court.

At the hearing in the circuit court, the judgment was against the Belding heirs, and seems to have been based upon the ground, that as the act of 20th April, 1832, reserved these lands from sale, the acts of the executive department in permitting their entry were void.

The Belding heirs appealed from this judgment, and at the January term, 1855, this court reversed the judgment of the Hot Spring circuit court, and remanded the same for further proceedings in accordance with the opinion of this court. At the re-hearing in the circuit court, Gaines obtained a judgment in ejectment. From this judgment Hale appealed to this court. At the July term, 1857, that judgment was affirmed by this court. By a writ of error the case was taken to the Supreme Court of the United States, and at the December term, 1859, that court affirmed the judgment of this court.—— (*22 Howard, 144.*) Immediately after the affirmation of the judgment of this court, by the Supreme Court of the United States, Hale and Rector filed separate bills in the Hot Spring circuit court, setting out at length the nature of their occupancy of the Hot Springs and the character of their respective claims, and asked that Gaines *et al.*, be enjoined from enforcing the judgment in ejectment. Hale, in his bill, sets up in substance, that Rector and the Belding heirs, acquired all their evidences of title with a full knowledge of all his legal and equitable rights, and asks that all such title be declared void as to them, and in trust for himself, and asks for a decree, vesting the S. W. ¼ of section 33, town, 2 south, range 19 west, in fee simple in himself and heirs. He concluded his bill with a prayer for an injunction against Gaines and Rector *et als.*, commanding them and each of them, to desist and refrain from proceeding to have any writs of restitution or writs of possession, or mandate of any kind, of and concerning the possession of the land aforesaid, issued or in any manner executed against your orator, or any of the tenants holding under him, until the final determination of this suit, and that they be perpetually enjoined. Rector, sets up in substance,

that Hale never acquired any right under the act of 1814, and that his New Madrid location intervened before the Belding heirs acquired any rights, legal or equitable, and concluded his bill with a prayer, that Gaines may be enjoined from enforcing the judgment obtained in the action of ejectment; or suing out process to obtain possession of the premises covered by the New Madrid location, and that the certificate and pre-emption of Belding's heirs be declared invalid, so far as they interfere with his said location. And that the pre-emption claim of Percifull, held by Hale, and the Cherokee certificate, attempted to be located by said Hale, be declared null and void, and that he be enjoined from setting up any right or title to the said Springs in virtue of either, and that by a final decree, that all clouds may be removed from his title to the said Hot Springs, etc. At the hearing, the cases of Rector and Hale were consolidated by agreement of the parties.

Gaines and the heirs of Belding filed their answer to the bills of Rector and Hale, wherein they deny, emphatically, that Hale ever acquired any legal or valid right or claim to the lands, including said Hot Springs, from Percifull or any other person, or by virtue of the Cherokee location. And in answer to the bill of Rector, Gaines denies that Rector acquired any title to the Hot Springs, by reason of the New Madrid location, on the ground that his location had never been filed with, or approved by the recorder of land titles, as was required by the act of February, 17, 1815. Having thus answered, Gaines protests that said complainants, by their said bills, have not made or presented a case to warrant the relief thereby sought, or any relief in the premises, but that the same, and the matters therein set forth, are insufficient, and they demur in law thereto. The answer concludes with a prayer that the temporary injunction, granted at the filing of the bills, may be dissolved, and that they be allowed to execute the judgment in ejectment, and that said bill be dismissed and respondents discharged.

Hale filed an amended bill wherein he sets up, that the certificate of the register and receiver given to the heirs of Belding, had been recalled and cancelled by the order of the secretary of the Interior.    Gaines answers, by saying, that he is advised such an order was made by the secretary of the Interior, but submits that the validity of said entry, or of their right of pre-emption, is in no wise affected or impaired thereby.    At the hearing, the circuit court found in favor of the Percifull claim, held by Hale, and as to Rector, in favor of the New Madrid location, for so much of his claim, as is not included within the south-west quarter of section thirty-three, town, two south, range nineteen west, and granted a perpetual injunction as against the Belding heirs, from enforcing or proceeding under the judgment in ejectment.    From this decree, Gaines appealed, and Rector appealed from so much of the decree, as in any way interferes with the New Madrid location, or any part thereof, which lessens the New Madrid location, about forty or fifty acres.

As to Hale's claim, the majority of the court are of the opinion, that he acquired no right under the pre-emption act of 1814, and that even if he had done so, that he has failed to establish his right before the register and receiver of the land office, who are the officers before whom these proceeding must be had.

As to Rector's claim, the majority are of the opinion that the New Madrid certificates could not be located on the land in controversy in 1819, because such certificates could only be located on lands, the sale of which *was authorized by law;* that it could not be located on the Hot Springs in 1838, because of the lands having been reserved by the act of May 29, 1832; and in disposing of their claims, the majority remark, that "neither Hale or Rector have any rights, which measured by the acts of Congress, have as yet matured into either a legal or equitable title to the land."    This finding, of course, fully authorized the reversal of the decree in the circuit court.    But

now comes the strange, and to me, incomprehensible part of the decision.

Instead of dismissing the bill and dissolving the injunction, the majority of the court, of its own volition, attacks the judgment at law obtained by Gaines, and which it is nowhere pretended, either by Hale or Rector, is either void or voidable, on the ground of accident, mistake or fraud, and, upon a mere question at law, reverses the decision, not only of this court, but the Supreme Court of the United States. It will be borne in mind that the bill, of both Hale and Rector, alleges that their evidence of title is of such a character that they could not avail themselves of it in the court of law, and that it is upon this ground alone that the portals of a court of equity was entered by these parties. Precisely the same evidence is submitted to this court, on the equity side of this case, so far as Hale and Rector are concerned, as was submitted on the trial, and at the hearing in this court upon the law side of the case, except the fact that the secretary of the Interior ordered the cancellation of the certificate of entry held by Gaines. At the hearing on the equity side of the cause, after the evidence, that was not available in the court of law, the majority found that Hale and Rector have failed to establish any shadow of either a legal or equitable, title to the land in controversy. I am of the opinion that where the bill seeks relief from the court, to which it is addressed, asking a decision as to the superior rights of the complainants, that a court of equity has no power to declare upon the rights of a respondent, who is simply asking to have the bill dismissed with costs, where the court shall have found that the complainants are not entitled to the relief asked. A court of equity only assumes jurisdiction for the purpose of enforcing an *equity*, and if it appear that no equity exists in favor of the complainant, then I am of opinion a court of equity is not authorized to interfere with the judgments of other courts, *on the ground* that a court of law *has committed an error*, and that is what, I conceive, the majority of the court have done in this case. *In Gaines v.*

*Hale,* (*16 Ark.,* *18*), Judge WALKER says that Hale rests his defense to the action of ejectment upon two grounds:

"*First* That the entry was made before the register and receiver, who had decided against *all* validity of the claim, upon the arbitrary and unauthorized direction of the commissioner of the general land office, in obedience to instructions from the secretary of the Interior." Thus it appears that the question, as to whether the commissioner of the general land office had authority to allow the entry to be made, was fairly and directly presented to the law court, and the court said: "We must, therefore, hold that the first ground of objection to the validity of the entry is not well taken."

The second ground of objection was: "That Belding's heirs failed to make the proof of pre-emption before the 29th day of May, 1831, and that before the passage of the act of July 14, 1832, extending the time within which to prove up pre-emptions claimed, under the act of May 29, 1830, Congress passed the act of April 20, 1832, whereby the land in controversy was wholly withdrawn from the control of the land officers of the government, and that all action of the land officers, in the sale or disposal of the land, is null and void.

In disposing of this question, Judge WALKER says: "That it is unnecessary to discuss the effect of the act of July 14, 1832, upon that of May 19, 1830, or of the act of May 20, 1832, upon the rights of Belding's heirs under these acts, as "the question which they are called upon to decide, is *not* whether Belding's heirs were, in fact, entitled to a pre-emption, but whether, under the state of the case presented before the register and receiver, their action was *extra-judicial and void;*" and, in reply to this proposition, the court say that they "are not void, nor can they be questioned when brought up collaterally for consideration, unless it may possibly be done in a proceeding between the United States and the claimant."

The fair legal presumption is, that all these officers acted within the scope of their lawful duties; and if they have not, I am at a loss to understand by what right Rector and Hale

came in and set them up, when a court of law and a court of equity have both decided that neither of them have any legal or equitable title to the land in dispute.

Again, in *Rector v. Gaines, 19 Ark.*, *80*, these same questions were presented to this court, and Judge SCOTT, in speaking of the reservation of April 20, 1832, says:

"If this act is operative as against the Belding heirs, the allowance and entry of the land was illegal and void for the want of power in the executive to sell the land in question."

The learned Judge says, following the lead of the Supreme Court of the United States, in *Lytle v. The State, 9 How., 314*, "that the pre-emption right of Belding operates as a prior and intermediate appropriation of the land, on the 29th May, 1830; that the right vested, although it was perfected under the act of July 14, 1832."

The majority of the court are clearly of the opinion, and seem to have come to the conclusion that, even if Hale and Rector had not rights cognizable in a court of law or equity, they would open a court of their own, and not only supervise the law judgments of the Supreme Court of the United States, that had not been attacked for fraud, accident or mistake, but set aside the acts of the officers of the Federal government, not on the ground that Hale or Rector's title was interfered with, but because, in their opinion, the officers were acting beyond the scope of their authority. Yet the majority of the court, in this case, grasp both these questions, and pass upon them with as much gravity as though there were some parties before the court whose rights would be sacrificed if this judgment of law should remain longer without emasculation.

It is a well established principle in law, that the complainant in equity must show a title to the thing he claims, *not in some other person*, but in himself. A defendant only comes into a court of equity by command of the court—he comes there, not to seek relief, but to answer those matters of which he is charged by the complainant, and it is of these matters only that a court of equity can pronounce, when it has been

ascertained that the complainant is not entitled to the relief asked.   It does not follow from this that a court of equity has jurisdiction to declare that a defendant has no rights, unless the defendant has asked the court to pass upon them, and this, Gaines has never asked of this court.   His plea has been that neither Hale or Rector had any legal or equitable title, and his prayer has been that the injunction be dissolved and the bill dismissed.   His title has already been passed upon by a court of competent authority, over whose judgment a court of equity has no supervisory power, in the absence of fraud, accident or mistake.

In the case of *Gaines et al. v. Nicholson*, (*9 How. 356*.) an action of ejectment was pending to try the legal title to a tract of land in Mississippi; the defendants filed a bill, on the equity side of the court, praying for a perpetual injunction, upon the ground that the plaintiff in ejectment had obtained a patent from the United States, by fraud and misrepresentation.   The State of Mississippi acquired a right to every sixteenth section, for school purposes, by virtue of certain acts of Congress, and the trustees were authorized to lease the same for the benefit of schools.   By the supplemental articles of treaty between the United States and the Choctaw Nation, one section of land was allowed to D. W. Wall *et al.*   Wall assigned his interest to Gaines *et al.*, who represented to the President that Wall, at the date of the treaty, resided upon and had made improvements thereon, thus bringing the particular parcel of land within the strict terms of the treaty, and presented a case paramount to any that could be pretended in the State or township, as a school reservation, and the patent issued to Gaines *et al.*   Armed with this patent, Gaines *et al.*, commenced an action of ejectment against the school trustees and the tenants holding under them.   The defendants in ejectment, filed their bill, alleging misrepresentation and fraud on the part of Gaines *et al.*, in procuring the patent.   On the hearing in the circuit court of the United States, a decree was entered that Gaines *et al.*, within sixty days, quit claim and relinquish to said

school trustees and their successors in office, and that in default, the clerk is hereby appointed a commissioner to make said conveyance. From this decree, Gaines *et al.*, appealed to the Supreme Court of the United States, and Justice NELSON, in disposing of the case says: "On looking into the answer and proof, there does not appear any evidence of fraud or imposition, nor anything to rebut the presumption, which we must assume till the contrary is shown, that the patent was issued with a full knowledge of all the circumstances upon which the complainants rely to invalidate it. Fraud is not to be presumed, and the burden therefore lay upon the complainant to establish it; and having failed, all ground for the equitable relief *failed also*, and the court below should have dismissed the bill, leaving the parties to the settlement of their rights in the action at law, as in the absence of fraud or imposition, in the issuing of the patent, the question was one of conflicting title and purely a question of law."

It strikes me that the doctrine laid down in the above case is applicable to the case before this court. As has been stated before, neither fraud, accident, mistake or imposition is charged or proven against Gaines, in procuring the certificate under which the action of ejectment was prosecuted. After patiently hearing the evidence adduced by Hale and Rector, this court, on the law and equity side, has declared that neither of them are entitled to a legal or equitable title to the land. Failing to establish an equity known to the laws of the State or United States, I am forced to the conclusion that the contest between the parties was a conflict of title, and therefore *purely a question of law*, arising under the pre-emption act of 1814, the New Madrid act of 1815, and the act of May 29, 1830, and having so failed, the conclusion, to my mind, is irresistible that this court can in no manner *review*, correct *or revise* the judgment of a law court upon this point, *even if it was erroneous*. In the case of *Richardson v. The city of Baltimore*, (*8 Gill. 433*,) the court held that "a court of equity has no right to interfere to arrest the proceedings of a court of law on the ground of *legal*

*error*, and that it has no *supervisory power over courts of law*, and that to justify the interposition of equity, there must be some inequitable advantage taken, which would render it unconscientious in the party obtaining it, to enforce the payment." It is not charged that any inequitable advantage was obtained by Gaines, over any of the parties in possession of the land, and if it had been charged, the majority of the court affirm that it was not inequitable. *Marsh v. Edgerton*, (*1 Chand. Wis. 198;*) *Marine Ins. Co. v. Hodson*, (*7 Cranch, 335.*) In *Hendrickson v. Hincklay*, (*16 How. 445*,) the object of the bill was to obtain relief against a judgment at law, and Justice CURTIS, in delivering the opinion of the court, says:

"A court of equity does not interfere with a judgment at law, *unless* the complainant has an equitable defense, of which he could not avail himself at law, because it did not amount to a legal defense." (*7 Cranch. 33;*) *5 How. 192; 14 How. 584.*

This is the burthen of the bills of Rector and Hale. They assert, in order to enter a court of equity, that they could not avail themselves of their defense in the court of law, on the ground that an equitable title could not prevail against the legal, in the law court, where the trial was had. If then this court find that Hale and Rector had no equitable title, I am unable to see by what authority the majority attacks the judgment at law, in favor of Gaines. It seems to me that if Hale and Rector have no equities, they have no reason to complain of the judgment at law any more than any other citizen of the State.

Rector and Hale were sued in a court of law, and claim to have a legal defense, but their evidence was of such a character that it could only be made available in a court of equity. In *Pollock v. Gilbert* (*16 Georgia, 402;*) in a case involving the principle just stated, it was held, that "when the jurisdiction of the court has once attached to a cause, the decision is final as to all matters *within* its *cognizance*, and operates as a bar to subsequent litigation in the same or any other tribunal, *and no*

*degree of wrong or injustice,* in the determination of a case at law, will entitle the injured party to resort to equity, unless there is some special ground for its interposition." In *Hempstead et al. v. Watkins,* (*6 Ark. 317.*) this court held, that "if a party defends at law, (and Hale and Rector did), chancery will not take cognizance of the cause, and re-hear it upon the same state of facts upon which it was tried at law, without the addition of any equitable circumstances (and there are none in this instance) to give jurisdiction, but will respect the judgment of a court of competent jurisdiction, already pronounced upon the facts." In *Sturdy v. Jackoway,* (*4 Wallace, 174,*) the Supreme Court of the United States held, that an action of ejectment, under the statute of Arkansas, "is a valid legal bar to a like action, subsequently instituted between the same parties for the same lands or premises, involving the same identical title and rights to the possession of such land." In *Van Wyck v. Seward,* (*1 Edwards' Chancery, 332,*) Van Wyck commenced an action of ejectment against Seward. At the trial, Van Wyck, in order to defeat the deed of Seward, attempted to establish fraud between Seward and his vendor, and in this he failed. Whereupon, he filed his bill, alleging the same facts and fraud that were presented to the court of law, and asked the interposition of a court of equity, and the chancellor said:

"I know no rule or principle by which a party can be permitted to litigate the matter over again, with the former judgment standing against him in full force, even though it should be an action of ejectment."

An examination of the case of *Gaines v. Hale* (*16 Ark. 11*), will show that Hale, in the action at law, set up:

1. That the certificate of entry relied on by Gaines is a mere nullity, and conferred no right to recover the land in question.

2. That the land was reserved by the act of April 20, 1832, for the future disposal of the United States, and the action of the register and receiver, in allowing the entry, was without authority of law, as fully as though they had acted without the instruction of the secretary.

3. That the pre-emption act of May 29, 1830, remained in force but one year, and that in as much as the heirs of Belding did not prove their cultivation, etc., within that year, that the certificate is no evidence of title.

It will be borne in mind that these are the precise questions that the majority now sit in review upon, and in which they say, that not only this court has twice erred upon, but that the Supreme Court of the United States has committed the same blunder, and this they do without having any equity alleged or evidence presented. In *Smith v. McIver*, (*9 Wheaton, 534*,) Chief Justice MARSHALL said, "If the grant be void * * * * it is void at law; if it be true that North Carolina had no power to issue the patents * * * a court of law is as capable of deciding on that as a court of equity * * *. The questions in these cases have all been decided at law, and the party can have no right to bring them on again before a court of chancery. What, were a court of equity, in a case of concurrent jurisdiction, to try a cause already tried at law; without the addition of any equitable circumstance to give jurisdiction, it would act as an appellate court, to affirm or reverse a judgment *already* rendered on the same circumstances, by a competent tribunal." Now, if it be true, as the majority of the court announce, that Hale and Rector have no legal or equitable title to the land, does it not necessarily follow as a conclusion of law and logic, that this court has no power to adjudicate upon a question of *law* that has been passed upon in a law court?

I have heretofore stated that I was of opinion that when this court had declared that neither Hale or Rector had a legal or equitable title, that the rights of the parties ought to be determined by the pre-emption act of 1814, the New Madrid act of 1815, and the pre-emption act of 1830. It is hardly necessary to state that the determination of the rights of the respective parties, under these different acts, are cognizable in a court of law, especially after a court of equity has determined that none of the parties are entitled to relief in that court. In

*Reeves v. Cooper*, (*1 Beasly, N. J. 224,*) the object of the bill was to restrain the enforcement of a judgment at law, and the court, after declaring that they were of opinion that there was no equity in the bill, remarks that, "This court is asked to correct alleged error in the judgment and proceedings of the Supreme Court, on the ground that the proceedings are errone-ous and contrary to law." And, in reply to that proposition, and such I consider to be the nature of the jurisdiction attemp-ted to be exercised by this court, the chancellor said : "It is true that a court of equity will sometimes interfere and grant relief against a judgment obtained by *fraud* or *imposition*, and also against a judgment of *extraordinary hardship*, as where the defendant, in the court at law, was ignorant of the fact upon which he relies for relief pending the suit, or it could not have been received as a defense, or he was prevented from availing himself of the defense by fraud or accident, or by the act of the opposite party, etc., (*6 Johns. Chancy. 86, 2 Green. Ch'y. 168,*) but every one of the questions, presented by this bill, are questions more appropriately belonging to law than equity. The questions involved are all pure questions of law, and the court has the power to give the party adequate relief, if he is entitled to it." And the court declined to adjudicate upon a question of law that had been passed upon by another court, and dissolved the injunction, and such, I conceive, is what ought to be done in this case. I am of opinion that an injunction is a secondary process, except it be for the preven-tion of torts, and is only to be granted in aid of some primary equity, which *must be disclosed in the same bill that prays it.* (*Washington v. Emery, 4 Jones Equity N. C. 29.*) If there is any equity in the bills of either Rector or Hale, the majority have been unable to find it. I am aware that when the major-ity of the court declared that neither Hale or Rector had any rights, which, measured by the acts of Congress, have as yet matured into either a legal or equitable title to the land, that they asserted that it did not follow from that fact that they had no rights or privileges whatever. I am compelled to con-

fess my obtuseness as to the distinction so finely drawn, as I have no knowledge of rights brought before a court of justice, that do not come under the head of legal or equitable right. All the right that Hale claims, he says he derives by virtue of the pre-emption made by Percifull, under the act of 1814, and the Cherokee location. Rector claims no rights except such as flow directly from the New Madrid act of 1815. Neither Hale or Rector claim any right to the possession or occupancy of the Hot Springs, under or by virtue of *any other right* or claim. If any equities have arisen to either of them they must have grown out of some act of Congress, and as the majority have not pointed out the particular act under which these rights, which are neither legal or equitable, are derived, and which, in their opinion, require protection to satisfy the conscience of a court when the relief granted is not asked. I may be pardoned for expressing an opinion, that these extraordinary rights are confined to the *lex non scripta* of this particular case. I do not profess to be even conversant with the principles of chancery law, but it appears to me that the object of the bills of both Hale and Rector, was to quiet their title to the Hot Springs, and if I am correct in this respect, then it appears to me that the principle of law laid down in the case of *Nicoll v. The Trustees of Huntington (1 Johns. Chancery 166,)* is applicable to the case now before the court. Nicoll, in the case just cited, claimed the lands in controversy by virtue of a patent issued in 1688, and asserted that owing to great changes that had taken place in the beach, between the bay and the ocean, since the patent was issued, that certain guts or inlets, then well known, cannot now be located without the testimony of aged witnesses, and prayed that this title might be established by a decree of the court, and that the trustees of Huntington be enjoined from entering on the lands and taking the profits, etc.

The trustees of Huntington admitted the granting of the patent to Nicoll, but insisted that the lands in controversy were not included therein. Nicoll had maintained several

actions of trespass against parties entering upon the lands in question, upon his continued possession of over one hundred years; but, inasmuch as the lands had become valuable, and inasmuch as the trustees of Huntington persisted in their claim, and were encouraging others to enter upon and carry away grass, etc., in despite of his title, he would be compelled to abandon his rights, or be led into a multiplicity of suits and great expense; therefore, he insisted that he had a right to demand the interposition of a court of equity, on account of the difficulties attending a remedy at law. He further claimed, that if it be found that the trustees had no title, that he, having shown a long and continuous possession, must prevail; and asked that an issue be so framed as to inquire into the title of the trustees, as well as that of himself, and that if neither party had a title, the property was in the State, as if the title was in the State, it would have weight in awarding the costs.

In 1811, a feigned issue was made up, and a verdict was found against the title of Nicoll, and the judge certified that he was of the opinion, and so declared to the jury at the trial, that neither Nicoll or the trustees had any title to the premises. A petition for a re-hearing was filed; and among other reasons, that the feigned issue, as directed, had only brought the title of Nicoll in question, without, at the same time, inquiring into the title of the trustees. The re-hearing was granted, and it is upon the disposition of the questions thus presented, that I find principles of law that are applicable to this case.

The chancellor, in disposing of the case, says: " The foundation of the bill is the legal right of the plaintiff (Nicoll) to the lands in dispute, and his claim to the assistance of this court, arises from the peculiar state of the property and the oppressive nature of the litigation which it involves. The case states a proper ground of equity jurisdiction, and if the title, Nicoll sets up, was sufficiently established at law, *before he came here*, or *was since established to the satisfaction of the court*, either upon its own view of the testimony, or by verdict upon one or more issues to be awarded at its discretion, it would

then be the duty of the court to declare that right by decree, and protect it by injunction. But, on the other hand, if the title of Nicoll fails on investigation, it would then be useless to put the parties to the expense of another feigned issue."

After reviewing the evidence and claim of title of Nicoll, the chancellor arrives at the conclusion that the land in controversy was not included within the patent upon which Nicoll based his claim to possession and title, and after having thus found, says: "The result is, that possession must be adjudged to belong to, and to be in the party who has the right; and, as Nicoll has no title, he has no lawful possession, and the equity of his bill has totally failed."

In disposing of the proposition to have the court pass upon the title of the trustees of Huntington, and in the event it should be found that they had no title, that the previous possession of Nicoll ought to prevail as to possession, the chancellor said: "It cannot be material whether the title set up by the trustees be good or not, as to the point of the dismissal of the bill. If the trustees have no title, yet the bill must be dismissed, because Nicoll *has no title*, and, consequently, *no equity to support his case.*"

It will be borne in mind that in the case now before the court, Gaines had established a legal title to the Hot Springs before the only forum authorized to pass upon titles of a legal character. I now submit that Hale and Rector, having come into a court of equity, and it having found against them, that they now stand in the position of a stranger, and are not entitled to any relief, by reason of their present possession, as it is not accompanied by any legal or lawful right.

In March, of 1850, the alcalde of San Francisco made a grant of the lots in controversy, and in December, of the same year, the Supreme Court of that State held, in *Woodworth v. Fulton, 4 Cal.*, that all such grants were void for want of authority, and were not evidence of title. By an act of Congress, of March, 1853, town sites were authorized on public lands, to be entered in the land office, for the use and benefit

of the occupants thereof.   Treadwell purchased, in July, 1853, of one McHenry, who had entered the same at the land office. In October, 1853, the same question was submitted to the Supreme Court of that State, and by some improper means, Payne ascertained that the opinion of the court had been prepared in the case of *Cotas v. Rasin, 3 Cal.*, wherein the former ruling of the court, as to the validity of the alcalde's titles, was overruled.

With this knowledge in his possession, and before the rendition of the decision of the court, Payne purchased the title held by the grantee of the alcade, for a nominal sum.   At the time of this purchase, Treadwell was improving the lots in question, and Payne had full knowledge that such improvements were being made.   At the hearing, Treadwell attempted to set up that the unlawful discovery of the forthcoming decision was not only a fraud as to the person from whom Payne purchased, but a fraud upon his (Treadwell's) rights as a citizen to have the law pronounced by the court for all at the same time.   The court said, in reply to that proposition, that the title was either in Payne or Payne's vendor; and that so far as Treadwell was concerned, it was a matter of little consequence to him, whether Payne or Payne's vendor held the title, and that so long as the vendor did not complain of the fraud, that a stranger to the title could not avail himself of a fraud.   And this I say of the cancellation of the certificate by the secretary of the Interior: That so long as the government does not complain, it is a matter of little consequence, to Hale and Rector, whether the certificate is cancelled or not, if they had no right that would be advanced thereby, and this court has declared they had none.

If Hale and Rector have made valuable improvements upon the land in controversy, I cannot see that this alters the equity of this case.   Hale made his improvements under the belief, that the pre-emption of Percifull under the act of 1814, or his Cherokee location, would protect him in doing so.   Rector made his improvement under the belief that his New Madrid

location would protect him in doing so. Gaines made his improvement under the belief that the pre-emption act of 1830, would protect him; and I cannot conceive that because Hale and Rector were mistaken as to their rights, that their mistake can be construed into an equity, as against one holding an adjudicated legal title. It may be said, that this legal title is cancelled, and in fact the majority of the court do say that, "the action of the secretary of the Interior, in ordering the certificate cancelled, was proper, and the judgment at law based upon it must fall." It is barely possible that a cancellation of a patent or certificate, by the mere order of the secretary of the Interior, would destroy the force and effect of a judgment at law, but I have been unable to find an instance in which this doctrine has ever been recognized by any of the courts of the Union. In my opinion, the power of that officer to cancel certificates or patents, must be exercised within the scope of his authority, and any citizen, whose interests are affected thereby, has the right to have the *courts* adjudicate as to whether the cancellation was a lawful or unlawful exercise of power: and until this has been done, I apprehend no court, professing to exercise an equity jurisdiction, would accept the action of the secretary of the Interior, in this respect, as forever settling the rights of parties, dealing with the government, and as Gaines, as yet, has not been allowed to enter a forum for that purpose, nor can he until some attempt shall be made by the government or some one holding a legal title therefrom, to interfere with his possession and occupation. In *Hale v. Gaines,* (*22 How., 160,*) Justice CATRON says: "It has been earnestly pressed on our consideration that the entry of Belding's heirs is void, because the land it covers was not subject to entry by an occupying claimant or any one else, after the act of April 20, 1832, had reserved it from sale." In reply to this proposition he says: "The plaintiff, in error, (Hale) is not in a condition to draw in question the validity of Belding's entry  *  *  *  being a trespasser, without title in himself, he cannot be heard to set up an outstanding title in the gov-

ernment to defeat the action. If Hale and Rector would not be heard by the Supreme Court of the United States, to set up a title in the government, does it not also follow, that the same parties should not be allowed to plead the cancellation of the certificate, by the secretary of the Interior? What is this but another way of pleading title in the government? If Hale and Rector have no title from the government, and the majority say they have not, what difference does it make to them, or what equity arises in their favor, even if the certificate of purchase, given the Belding heirs, was legally cancelled? Does the cancellation of that certificate confer any right of possession on Rector or Hale? I think not. In *Groom v. Hill* (*9 Mo. 322*), the question arose: whether the commissioner of the general land office had the power to cancel a certificate, in a case where fraud or mistake was not alleged, and the court said: "It is probably the duty of the commissioner to revise the proceedings of the register and receiver and vacate entries which may have been illegally made, and thereby arrest the completion of a title, *originating in fraud, mistake or violation of law*, but until his action assumes a shape recognized by law, it cannot effect the previous sale; that "the sale stands for what it is worth, at the time it was made, and cannot be *vitiated or annulled* by any subsequent *ex parte* proceedings of officers, provided, it was legal and valid at the time it was made, (now mark what the court says,) and of its *legality and validity, the courts must necessarily be the judge.*" Neither fraud or mistake is alleged in this case, and as to the entry and certificate being in "violation of law," Justice CATRON, (*22 How. 160,*) says, that, "Hale is not in a condition to draw in question the validity of Belding's entry, being a trespasser, without title in himself." If Hale and Rector cannot draw in question the validity of Belding's entry, the cancellation of the certificate cuts a very small figure in this case. The pleading this cancellation by the secretary of the Interior is but another mode of pleading title in the government, and this, the Supreme Court of the United States say, cannot be done, and it is upon

authority of this character, that I am compelled to differ with the majority on this point.   Whether Gaines has any title, as against the government, is a question that, in my opinion, is not before the court at this time, and for this reason, I express no opinion upon that subject.   Nor am I aware of any law, under which State courts obtain or acquire authority or jurisdiction to pass upon the title, as between the United States and one of its citizens, in a proceeding in which such a finding is not necessary to the determination of the rights of the complainants, and I am clearly of opinion, that all such findings are mere gratuities, that can never amount to the force and effect of a judgment.

The majority of the court are of opinion that they are authorized to grant a perpetual injunction, under the prayer for general relief, in the absence of a prayer for specific relief. I am compelled to dissent from their conclusion in this respect, and am of opinion, that, to entitle a complainant to relief, under the general prayer, different from that specifically prayed, the allegations relied upon must not only be such as to afford ground for the relief sought, but they must have been introduced, into the bill, *for the purpose* of showing a claim to the relief, *and not for the mere purpose of corroborating the complainant's right to the specific relief prayed*, and that in all cases when it is doubtful with the complainant, or those who advise him, whether he is entitled to the specific relief prayed, that the bill ought to be so framed, that if one species of relief sought is denied, another may be granted.   The prayer for specific relief in Hale's bill is, that Rector and Gaines may be enjoined from enforcing any and all writs of possession, *until the determination of this suit*, and such other relief as may be consistent with his rights, *upon the adjudication of his title*. It will be observed that the prayer of Hale is, that the injunction may continue *until the determination of this suit*, and that he may receive such relief as may be consistent with his rights, *upon the adjudication of his title*.   He asks for no protection, save such as may be due him upon the adjudication of his

*title.*  His title has been adjudicated, and the majority say he
has none; now what relief is he entitled to? The specific
prayer of Rector's bill is, that Gaines may be enjoined from
enforcing his judgment in ejectment, and that the certificate
held by Belding's heirs be declared null and void; that the
pre-emption claim of Percifull, and the Cherokee certificate,
held by Hale, declared void; that Gaines and Hale be enjoined
from setting up any right or title to said Springs, and
that, by a decree, all clouds may be removed from his title to
the said Hot Springs, and such other relief as may be consis-
tent with the nature of his case.  What relief would be con-
sistent with the nature of a case that has no standing in a
court of law or equity?  To the special relief prayed for, by
either Hale or Rector, the majority say, Hale and Rector are
not entitled to it, upon the ground presented to the court.
But they say that, "settlers making valuable improvements on
public lands have not been regarded as trespassers; that this
State, by statute, treats and protects such improvements as
property."  The protection afforded by the State to this class
of improvements, to which the court alludes, is found under
the title of *ejectment*, which says: "The action of ejectment
may also be maintained, where the plaintiff claims possession
of the premises, under or by virtue of:

"*First*, An entry made with the register and receiver of the
proper land office of the United States.

*Second*, A pre-emption right under the laws of the United
States.

*Third*, Where an improvement has been made by him on
any other public lands of the United States, whether the same
has been surveyed or not, and where any other person, other
than those to whom the right of action is given by the pre-
ceding clauses of this section, is in possession of such improve-
ment."

This section of our statute *does not* protect the improvements
of either Hale or Rector, because it expressly provides that
the claim of improvement *cannot* be set up against "an entry

made with the register and receiver of the proper land office, or a pre-emption right under the laws of the United States." The Belding heirs claim under and by virtue of a judgment in ejectment, based on a "certificate of entry with the register and receiver of the proper land office," which certificate is based upon a "pre-emption right under the law of the United States."

This case then comes within the rule laid down in the case of *Groom v. Hill,* (*9 Mo. 322,*) where the court declared, under a state of circumstances precisely similar to those in this case, that, "the sale must stand for what it is worth at the time it was made, and cannot be *vitiated and annulled* by any subsequent *ex parte* proceedings of officers, provided it was legal and valid at the time it was made; and of its *legality and validity,* the court must necessarily be the judge." It is hardly necessary for me to state, that neither Hale nor Rector can raise the question of the legality and validity of the entry, after the court had declared that neither of them have "any rights which, measured by the acts of Congress, have matured into a legal or equitable title." In the case of *Frisbie v. Whitney,* (*9 Wal. 187*), the Supreme Court of the United States held, "under the pre-emption laws of the United States, the pre-emptor acquires no vested rights, *until the money has been paid,* and the receipt of the proper land officer given to the purchaser." The Belding heirs have *paid the money,* and obtained the receipt of the proper land officer. This, the Supreme Court of the United States, in the latest decision on the question says, constitutes a vested right. Has the court any authority to declare that this vested right can be adjudged a nullity in a proceeding in which the United States are not a party, and at the instance of men, the majority of this court say, who have no legal or equitable rights? I am disposed to doubt it. The bill no where alludes to any right of the parties under this statute, nor was this suit commenced to retain *possession* under the statute just quoted, nor can an action under that statute be brought in a court of equity.

There is no prayer for an injunction, that in the event the court should find the title is in the United States, as was the case in *Nicoll v. The Trustees of Huntington,* and if there had been, I could not have consented to grant it on the motion of a party that the court declares have neither a legal or equitable title to the land. It is a rule of courts of justice to disregard the right of a party, under a statute of limitation, unless the party desiring to avail himself of its benefit, shall plead the statute. Courts of equity, ought never to grope around among the statutes, to find a statutory right for the benefit of a party that waived all rights he might have had under it, in the court below. If Hale or Rector were entitled to any benefit or right by virtue of this provision of the statute, (a thing I do not concede) they ought to have plead it as fully as they would have pleaded a statute of limitations. The only excuse or authority that the majority of the court pretend to give, for invading the judgment at law, is, that the *certificate* has been cancelled, upon which the judgment was obtained. How this court is advised that the judgment at law was based upon this certificate alone, they do not state in their opinion.

Our statute allowed the action of ejectment to be maintained, upon an entry with the register and receiver of the land office, and also upon a pre-emption made under the laws of the United States. Now the evidence of pre-emption, as well as that of the certificate of the register and receiver of the land office, seems to have been submitted to the law court.

The register and receiver, in their report to the commissioner of the general land office, both agree that Belding was in possession of the Hot Springs, and had a portion of the land in controversy in cultivation, as required by the act of 1830, and the only question of difference between them was as to whether Belding was in possession in his *own* right, or the right of another. The presumption of the law is, that the judgment was authorized by the evidence, and how this court can determine whether the judgment was rendered upon the *certificate,*

or the evidence of pre-emption, is more than I am able to determine.

It will be borne in mind that Gaines only submits his evidence of title in response to the bills of Hale and Rector. I admit that they were entitled to a discovery of the title of Gaines, *so far as was necessary* to establish the superiority of their own, but when this discovery had been made, and the complainants had failed to show, either a legal or equitable title to the land in dispute, I deny their right, or of this court, to inquire into the title of a defendant, disclosed under such circumstances, (*4 Bouv. Inst., 111*).

If the complainants are entitled to any relief, it is upon such equities as they may have acquired under the different acts of Congress, and not under the law of this State, regulating the action of ejectment. They have pleaded no rights under the statute; they have relied on the acts of Congress for possession and title, and by these acts they must stand or fall.

Upon the findings, in relation to the title of Hale and Rector by the majority, I am of the opinion that the injunction ought to be dissolved, and the bill dismissed. I am also of the opinion that the decree as to costs is palpably erroneous.


Bowen, J., dissenting, says:


The opinion of the majority of the court, in this case, contains the following:

"Counsel for Rector have filed two briefs, of fifty-eight and sixty-eight pages respectively, in which they have insisted that the Supreme Court of the United States, commencing with the case of *Bagnell v. Broderick*, down to the case of *Rector v. Ashley*, have omitted to notice the act of April 29, 1816, and its effect upon the act of February, 7, 1815. If this were true, it would certainly be a most remarkable case of judicial oversight. A careful examination of this act, however, will show that counsel are mistaken, and that the practical effect of the act of 1816, so far as it changes or modifies the act of 1815, is

simply to abolish the office of principal deputy surveyor and all other surveyors' offices that had previously been established," etc.

My own success, in the direction of finding any case decided by the Supreme Court of the United States, ·in which the act of 1816 has been construed, has not been greater than that of the counsel referred to.   Why the act of 1816 has never been noticed, it is not my province to determine.   That it has not, I am very clear; and whether from judicial oversight, the oversight of counsel, or from the state of facts in the cases determined, rendering it prudent for the parties seeking to perfect or quiet their titles, not to press a construction of that act, the plain, unvarnished fact stands forth in bold relief that the Supreme Court of the United States never has construed it. I am unwilling to indulge in the presumption that, in the determination of the various cases under the act of 1815, that court silently passed over the act of 1816, on the ground that it would be taken for granted that the non-effect of the latter on the former act was so patent as to render it a work of supererogation on its part to even refer to the latter act.   I am equally unwilling to accept as authority the decisions of any court, simply because they belong to the same general class, when it is clearly apparent that the case at bar presents questions not even noticed in former adjudications.   The rule on this point is so old and well established that it need only be mentioned to be recognized.

The New Madrid act of February 17, 1815, required, among other things, a return of the plat of location to the recorder, together with notice, etc.

The act of April 29, 1816, provided that "all plats of the surveys, *and all other papers and documents* pertaining to, or which did pertain to, the office of surveyor general, under the Spanish government, within the limits of the territory of Missouri, or to the office of principal deputy surveyor for said territory, or to the office of surveyor general, *or to any office hereafter established or authorized for the purpose of executing or*

RECORDING *surveys of lands* within the limits of the territories of Missouri and Illinois, shall be delivered to the surveyor of lands of the United States, authorized to be appointed by this act; and any plat of survey, duly certified by said surveyor, shall be admitted as evidence in any of the courts of the United States or territories thereof." And the third section provides, that "*any act* of Congress heretofore passed that is repugnant to, or inconsistent with, any of the provisions of this act be, and the same is hereby repealed."

The act of 1815 required the surveyor to return a notice and plat to the recorder. The act of 1816 directed him to make out general and *particular* plats of all lands surveyed, and to send them to the registers and receivers of the land office, and to the commissioner of the general land office. I cannot, therefore, agree with the court, in its position, that "the act of 1816, so far as it changes or modifies the act of 1815, is simply to abolish the office of principal deputy surveyor and all other surveyor's offices that had previously been established."

The office of recorder of land titles was certainly included in the sweeping sentence, "or to any office heretofore established," etc., "for the purpose of executing or *recording* surveys," etc., as used in the act of 1816. The notice and plat required to be returned to the recorder, by the act of 1815, are certainly embraced in the term "all plats of the surveys, *and all other papers and documents*," as used in the act of 1816.

Thus it will be seen that the act of 1816 not only abolished the offices of principal deputy and other surveyors, but likewise created new and different depositories for plats, surveys *and other documents*, and provided new channels through which all plats and surveys found their way to the registers' and receivers' offices, and the head of the land department of the United States, the commissioners' office; and whatever was inconsistent with or repugnant to these provisions, in *any* act of Congress, was expressly repealed.

If these views should eventually be held correct, their bear-

ing, upon the rights of the parties here, would be of immense importance; for, from a most careful consideration of this case, I am much inclined to believe that, adopting the construction herein given, as to the effect of the act of 1816 on that of 1815, Rector fairly establishes his claim to the property in controversy, by showing a compliance; not only on his part, but also on the part of the officers of the government, with the provisions of the statutes. The wide difference of opinion on this one point, however, existing here, renders it unnecessary for me to take up the other points in detail.